# Richmond

## B. AGEE BOWLES V. MAE F. MAY.

November 17, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

o

The opinion states the case.

*Wilson M. Farr, Hugh B. Marsh* and *Frank L. Ball,* for the plaintiff in error.

*Barbour, Keith, McCandlish & Garnett* and *Charles Pickett,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

The plaintiff in the trial court obtained a verdict and judgment for physical consequences of fright or mental shock, unaccompanied by contemporaneous physical injury. From that judgment the defendant obtained a writ of error. The notice of motion was not skilfully drawn. It contains elements of trespass, assault, slander and the use of insulting words, combined in a recital of events with no attempt to segregate the allegations constituting the different causes of action in separate counts. Notwithstanding the liberal construction given to notices of motion under Code, section 6046, the demurrer to the notice should have

been sustained and the plaintiff required to state her cause of action with reasonable precision. The defendant was unnecessarily handicapped, in pleading to the notice, in ascertaining the real basis of the plaintiff's cause of action, and in making preparation for his defense.

■■ The object of all pleading is the production of an issue, and, when it is one of fact, to confine the introduction of evidence to the relevancy of the issue thus made, so that there will be no confusion in the minds of the jury as to the question to be decided. The result of this failure to produce a clear-cut issue is reflected in the mass of irrelevant matter introduced in the record and the abstract principles of law stated in the plaintiff's instructions, which tended to confuse, rather than to aid, the jury.

■ The development of these conclusions ordinarily would dispose of the case, but inasmuch as the record contains all the evidence even remotely connected with the real issue and discloses that the people in the neighborhood in which the alleged cause of action arose have been much disturbed by the scandalous matter involved, we will dispose of the case on its merits.

The admitted facts are, that the defendant, who lived with his wife and two sons in Arlington county, Virginia, was an active vice-president of the Potomac Savings Bank of Washington, D. C.; that R. P. Mills, together with his wife and two children, lived upon, owned and operated a small dairy farm in Fairfax county; that in 1928 Mills became financially involved, among other debts owed one to the Potomac Savings Bank, which had reduced its claim to judgment; that he sought financial aid through the defendant, who caused a report to be made of the value of the farm, and after a personal inspection extended financial aid to him and thereafter became his business adviser, as a result of which Mills seems to have prospered. Mrs. Mills was often in Washington and on a number of occasions the defendant took her home as he was returning to his own

home from his place of business; sometimes he carried her all the way and sometimes she was met by Mr. Mills.

The plaintiff, with her husband, lived on the highway within a quarter of a mile of the Mills farm, where they met the defendant. Subsequently, Mr. May obtained through defendant a loan from the Potomac Savings Bank.

All the parties seem to have been, if not friends, on very good terms until January 5, 1930, when plaintiff, for some cause, stopped buying milk from Mr. Mills. In 1929, a rumor was current that the relation between Mrs. Mills and the defendant was not what it ought to be. This rumor reached the defendant, who at first paid no attention to it. In February, 1930, Mr. Mills informed the defendant that the Mays, i. e., the plaintiff and her husband, had originated the gossip, which was to the effect that defendant had given Mrs. Mills silk underwear, a fur coat and a car for Christmas, and that he had parked his automobile at or near the driveway to plaintiff's home and, together with Mrs. Mills, had sat therein until a late hour of the night. Defendant stated to Mr. Mills that if his visits to his home had embarrassed him, his wife, or caused talk in the neighborhood he would discontinue them, to which Mills replied that if he had thought defendant was going to take that view of the matter he would never have mentioned the rumor to him; that he had always been, and was, a welcome visitor in his home. Defendant then determined to take the matter up with plaintiff and her husband.

Within a few days after this interview, to-wit, February 21, 1930, defendant went in his automobile to the Mills home and after talking with them a few minutes walked from their place over to plaintiff's home for the purpose, in good faith, as he stated, of investigating the reports which were being circulated. The defendant entered the living room of the plaintiff, and when the three—i. e., plaintiff, her husband and defendant—were seated, told them that he wanted to talk to both husband and wife, and stated the

purpose of his visit. What occurred during the interview is in dispute.

Plaintiff and her husband both testified that defendant's exact words were, "Mrs. May, you have made criminal, libelous statements against me and Mrs. Mills. I am financially able to fight this to the limit. It means a jail sentence, and that is where I intend to see you go. I am a lawyer by profession." They further testified that in using this language, "his manner was threatening, menacing, boisterous and beastly;" that Mr. May warned defendant of his wife's condition and told him he would have to return to their home and retract the charges he had made against his wife. For twenty minutes or more he continued to discuss the matter with defendant and insisted that neither he nor his wife had repeated any such reports and that both of them would sign affidavits to that effect if he would prepare and present them. Defendant left with that understanding.

On the night of February 25th defendant returned, produced the paper he had prepared in the form of an affidavit, and the subject was discussed for some time. Plaintiff and her husband were not satisfied with the affidavit and did not sign it; they brought up other rumors concerning defendant and Mrs. Mills. As defendant was leaving he offered to shake hands with plaintiff, who refused. Her account of the matter was, that "he turned on me in a very ungentlemanly, angry manner and said that I would never have the opportunity to shake hands (with him) again."

It appears that in the spring or summer of 1927 plaintiff had suffered a stroke of paralysis which affected her left leg and arm and to some extent her power of speech; that she improved slowly and by December, 1927, was dismissed by her physician, with instructions to avoid crowds or excitement; and that she moved to Fairfax county for the purpose of remaining quiet, and continued to improve. Shortly after taking up her residence in Fairfax her home was destroyed by fire; this occurred while her husband was

performing his duties as clerk in Washington and while she and a neighbor's two children under six years of age were alone on the premises. Her nerves were somewhat affected by this occurrence, causing her to remain in bed a day or two, but when her husband was rebuilding the house she was able to help him put the roof on and subsequently, during the day while her husband was in Washington, looked after fifteen hundred, or more, young chickens. On the night of February 21st, after defendant left, she was nervous, restless and unable to sleep, and on the evening of February 26th she suffered a second stroke of paralysis in which the same parts of her body were affected, her power of speech being more seriously impaired than before. At the time of the trial, more than a year later, she was able to walk with a crutch and her power of speech had greatly improved.

It is claimed that the wrongful acts of the defendant caused fright or mental shock to plaintiff, resulting in the second stroke of paralysis.

When the jury returned its verdict of $2,500 for plaintiff, defendant moved to set it aside on various grounds—among others, (1) because it was not established that defendant had violated any duty he owed to plaintiff, and (2) because, even if he had, the physical injury was not the direct and probable result of the alleged wrongful act.

To determine whether defendant violated any duty he owed to plaintiff requires a careful examination and analysis of the evidence.

Defendant was known by plaintiff and her husband in both a business and a social way; he had been in their home on several occasions for the purpose of using the telephone; and he testified that he had a standing invitation to visit them socially; but whether he had or not, when he was informed that these parties were circulating false rumors which reflected upon his good name he owed to himself and to his family the duty to investigate the reports. He denied making any gift to Mrs. Mills except a clock which he gave to the family. In this he was corroborated

by both Mr. and Mrs. Mills, and this evidence stands uncontradicted in the record.

When he sought an interview with plaintiff, he approached the front door carrying a flashlight and was there met by her husband. There was a good deal of quibbling as to whether he was invited in or walked in without an invitation, and whether he removed his galoshes before entering; but according to both plaintiff and her husband all parties were seated before he made known the purpose of his visit. The entry was lawful and his subsequent conduct did not make him a trespasser.

The only evidence which tends in the slightest degree to sustain the suggestion that defendant was guilty of an assault was the testimony that he shook his finger at plaintiff. If this was done, it was while the parties were seated and plaintiff was some eight feet or more from where defendant was sitting. This does not constitute an assault.

This leaves for our consideration the question whether the manner and the language used by defendant constitute a tort. From what has been said already it is apparent that the occasion was qualifiedly privileged. When such is the case, even though the words spoken are untrue and defamatory, in order to establish liability it must be proven that the scope of the privilege was exceeded, or the words were spoken with actual malice. *Rosenberg* v. *Mason,* 157 Va. 215, 160 S. E. 190. Where the facts are in dispute the question must be submitted to the jury, with proper instructions.

In this case, the question, so limited, was not submitted to the jury. On the contrary, the plaintiff requested and the court granted the following instruction:

"The court instructs the jury that every man's home is his castle and that one who enters another's home without authority, express or implied, is an intruder and a trespasser. The court further tells the jury that it is unlawful for anyone to falsely utter and speak of and concerning another person any words which from their usual construc-

tion and common acceptation are construed as insults and tend to violence and breach of the peace or to use grossly insulting language to any female of good character or reputation. And if the jury shall believe from the evidence in this case that the defendant entered the plaintiff's home without authority or did then and there falsely utter and speak of and concerning her words which from their usual construction and common acceptation are construed as insults and tend to violence and breach of the peace or did then and there use grossly insulting language to the plaintiff, then the defendant's entry and conduct were wrongful and unlawful."

This instruction permitted the jury, with practically no evidence, to find that the defendant was a trespasser, and ignores all the evidence tending to prove that the occasion was one of qualified privilege.

The proper issue not being submitted to the jury, we must determine whether there was sufficient evidence to support a verdict for the plaintiff if such issue had been submitted.

The conduct of plaintiff, her husband, and defendant, as testified to by both plaintiff and husband, is inconsistent with the claim that defendant's manner and language establish an abuse of a qualified privilege. It is inconceivable to the impartial mind that a normal husband, with full knowledge that his wife is about to "collapse or faint" from the effect of a gross insult and a threat of criminal prosecution, would sit quietly by and fail to resent such treatment in no uncertain terms. Plaintiff and her husband admit that defendant was not ordered, or even requested, to leave the premises; but on the contrary, they calmly remained in their seats after the alleged insult was committed and for twenty minutes continued to discuss the matter with defendant, and agreed that for the benefit of defendant, the man who was guilty of such conduct, both of them would sign papers denying that they had taken any part in circulating the reports. This interview was terminated by the husband inviting (at

least by implication) defendant to return to his home, notwithstanding the claim that it was begun with a gross insult and threat to the wife. The cross-examination of the husband as to his resentment and his invitation is as follows:

"Q. Then Mr. Bowles left your home under what conditions—that he was to return with the proposed affidavit, or what?

"A. As to the affidavit, that was discretionary with him. I advised Mr. Bowles when he left on that occasion that it would be absolutely necessary for him to return and make a retraction of the charges that he had brought against my wife.

"Q. Why didn't you demand that he make one immediately? Why didn't you demand that he make a retraction right then and there, Mr. May?

"A. In substance, the demand—while the words were not used, the effect was in substance that that was implied, that I was demanding a retraction at all times.

"Q. Did you demand a retraction of him right then and there?

"A. Not in words; no.

"Q. You did not do it, and you could only have done it by words, could you not?

"A. If you want to assume it that way.

"Q. Could you have demanded it other than by words?

"A. My object there was to lessen the effect of the occurrence on Mrs. May's condition.

"Q. And you thought that a second trip was best calculated to lessen the effect of it? You wanted to keep it fresh in her mind?

"A. It would receive less consideration the second trip. Whether that would be best or not, the thing in my mind was to lessen the effect of this occurrence on Mrs. May's condition. Whether the second trip was necessary it does not indicate it.

"Q. Do you think you can now answer my question, please, did you then and there demand a retraction from Mr. Bowles of the statements he had made?

"A. No, I did not make a demand right then and there."

This testimony is untrustworthy and eliminates from our consideration the claim that demand for retraction was made. The husband does not state that he showed resentment in any other manner. He does state that he gave defendant notice of plaintiff's physical condition, thus:

"I interrupted Mr. Bowles and called Mr. Bowles' attention to the fact that my wife's condition was such that she could not stand accusations brought against her in that manner; that he would have to quiet down."

This statement came early in the interview and the husband said nothing further about his wife's condition except that her then condition was such that he would not permit her to take any part in the discussion, and yet both he and the plaintiff state that every time she tried to say anything or deny circulating the report, defendant would hold up his hand at her, "as if to say shut up."

There are other inconsistencies in the testimony of both plaintiff and her husband. We have cited the most glaring for the purpose of comparing their account of the interview with that of defendant, who states that he told them:

"I have come down here on a rather unpleasant visit. There has come to my attention the fact that Mrs. May, as well as you, but Mrs. May in particular, have been spreading reports in the community that reflect upon me personally. These reports reflect upon Mrs. Mills, and Mr. Mills as well as me; I have heard these things and believe them and I want to ask you to make some explanation of them. * * *

"I told them * * * that I knew them (the reports) to be untrue; that there was no cause for their circulation; that I had come there for the purpose of asking an explanation of why they had made them. They both then and there very forcefully and very clearly denied, first, that they

had ever made any such statements—claimed that neither one of them had ever made any such statements. They then denied that either one of them had ever heard any such statements; and they both of them assured me that neither of them would believe any such statements had they heard them.

"The matter was discussed along at some length then. At no time did either Mr. May, or at no time did Mrs. May, by word, act, or deed, indicate to me that the remarks that I was making, that the conversation that I was having, which was in a tone just about as I am talking now—at no time did either of them indicate to me that what I was saying was having any adverse effect upon her. * * *

"The conversation was carried along just exactly in the same tone and manner in which I am talking now. I was positive. I am positive now, but my voice and attitude in talking was no different from what it is at this time. * * *

"Then the discussion was led to the fact that Mr. May suggested that they were willing, or Mrs. May was willing, to make an affidavit that she had not made any such statement; that she had not heard any such statements; that neither he nor she would believe them if they had. They both said that that was their position. * * *

"* * * It was my desire that Mr. May prepare it (the affidavit), but for some reason he wanted me to prepare it, and wanted me to bring it back, and wanted me to be very definite as to what time and date I would bring it back; and I told him I would do it as soon as it was convenient to me to do so."

On the night of February 25th, the defendant returned to the Mays' home, and when the parties were again seated, practically as before, the defendant produced a paper in the form of an affidavit which he stated he read aloud and then gave to Mr. May. The latter testified that he raised two objections to the paper—one that he and his wife expected to sign separate affidavits, and the other that it contained a clause to the effect that the reports of which the defend-

ant was complaining were untrue, and that neither he nor his wife knew whether they were true or not, and for that reason they could not sign a paper containing that clause. Again the matter was discussed some thirty or forty-five minutes. The Mays claim that they had informed the defendant on his first visit that Helen, a twelve year old daughter of Mrs. Mills, had made these statements to them and that on his second visit they told him of even more scandalous matter which Helen had told them.

Defendant states that nothing was said about Helen Mills on his first interview with plaintiff and her husband, but on the night of February 25th they did tell him they had heard these reports from the child; whereupon he stated that he was very much surprised that they should have encouraged an irresponsible child to discuss rumors of that nature, especially when the reputation of her own mother was involved, and he would have to report the matter to Mr. and Mrs. Mills; and that soon thereafter he put the unsigned paper back in his pocket and left, but before leaving extended his hand to Mrs. May, who refused to accept it.

Plaintiff testified that Helen Mills had made to her these statements reflecting on Mrs. Mills; that she had told them to her husband, and that he had called the child into their living room and in plaintiff's presence had questioned her concerning the reports. It appears that on the morning of February 22nd plaintiff had accompanied her husband on a trip through the neighborhood, and they had discussed with the neighbors the gossip concerning the defendant and Mrs. Mills. Mr. Burroughs, a witness called by the plaintiff, testified that in 1929-30 plaintiff and her husband had discussed these same rumors with him.

While Helen Mills denied telling the rumors to either plaintiff or her husband, they knew and had discussed the reports before the first interview with defendant. If defendant's manner was so "beastly" and his language so insulting, it is strange that plaintiff and her husband should have consented to hear him in another interview and on that

occasion go into the discussion of other rumors of which they evidently knew defendant had not heard.

■ In our opinion, reasonably fair-minded men can draw only one conclusion from this evidence, *i. e.*, that under all the circumstances neither the conduct nor the language of defendant exceeded the qualified privilege.

But even if doubt exists as to the correctness of this conclusion, the same result will be reached by the answer to the second question: Are the damages claimed the natural and probable consequences of the alleged tort? In other words, can the court trace the chain of causation from the utterance of the words to the physical injury of the plaintiff?

■ There is a sharp conflict in the authorities as to whether there can be a recovery for fright or mental shock unaccompanied by contemporaneous injury when the action is based upon mere negligence. However, it seems settled in Virginia that there can be no recovery for mental anguish and suffering resulting from negligence unaccompanied by contemporaneous physical injuries to the person. *Awtrey* v. *N. & W. Ry. Co.*, 121 Va. 284, 93 S. E. 570, L. R. A. 1918D, 279; *C. & O. Ry. Co.* v. *Tinsley*, 116 Va. 600, 82 S. E. 732; *Connelly* v. *Western Union Tel. Co.*, 100 Va. 51, 40 S. E. 618, 621, 56 L. R. A. 663, 93 Am. St. Rep. 919.

The reason for this rule was stated by this court in *Connelly* v. *Western Union Tel. Co.*, *supra*, in an excerpt from *Francis* v. *Western Union Tel. Co.*, 58 Minn. 252, 59 N. W. 1078, 25 L. R. A. 406, 414, 49 Am. St. Rep. 507: "The difficulty in such cases is the character of the damages claimed. The injuries in such cases are too hard to determine with any reasonable certainty—are more often assumed than real—and the suit too liable to be wholly speculative. If everyone was allowed damages for injuries to his feelings caused by some one else, the chief business of mankind might be fighting each other in the courts. Damages for mental suffering open into a field without boundaries, and there is no principle by which the court can limit the

amount of damages. Mere logic will not dispose of a question of this character. The court must keep one eye on the theoretical, and the other on the practical."

The illogical position taken by the courts which deny recovery in such cases is recognized and stated by Mr. Justice Holmes in *Homans* v. *Boston Elevated Ry. Co.*, 180 Mass. 456, 62 N. E. 737, 57 L. R. A. 291, 91 Am. St. Rep. 324, as follows: "As has been explained repeatedly, it is an arbitrary exception, based upon a notion of what is practicable, that prevents a recovery for visible illness resulting from nervous shock alone. *Spade* v. *Lynn, etc., R. Co.*, 168 Mass. 285, 288, 47 N. E. 88, 38 L. R. A. 512, 60 Am. St. Rep. 393, 395; *Smith* v. *Postal Telegraph Cable Co.*, 174 Mass. 576, 55 N. E. 380, 47 L. R. A. 323, 327, 75 Am. St. Rep. 374. But when there has been a battery and the nervous shock results from the same wrongful management as the battery, it is at least equally impracticable to go further and to inquire whether the shock comes through the battery or along with it. Even were it otherwise, recognizing, as we must, the logic in favor of the plaintiff when a remedy is denied because the only immediate wrong was a shock to the nerves, we think that when the reality of the cause is guaranteed by proof of a substantial battery of the person, there is no occasion to press further the exception to general rules."

The plaintiff contends that those authorities which deny recovery for physical injury resulting from nervous shock are not based upon the fact that the injury was not caused by the wrongful act of the defendant, but because such courts have adopted an arbitrary rule to deny damages in all such cases; that this case is not based upon a tort which is the result of a negligent act, but upon a wilful, wanton and vindictive wrong; and that it should be controlled by the decisions in the following cases: *May* v. *Western Union Telegraph Co.*, 157 N. C. 416, 72 S. E. 1059, 1060, 37 L. R. A. (N. S.) 912; *Newell* v. *Whitcher,* 53 Vt. 589, 38 Am. Rep. 703; *Hickey* v. *Welch,* 91 Mo. App. 4; *Preiser* v. *Wie-*

*landt,* 48 App. Div. 569, 572, 62 N. Y. S. 890; *Brownback* v. *Frailey,* 78 Ill. App. 262; *Lesch* v. *Great Northern Ry. Co.,* 97 Minn. 503, 106 N. W. 955, 7 L. R. A. (N. S.) 93; *Jeppsen* v. *Jensen,* 47 Utah 536, 155 Pac. 429, 431, L. R. A. 1916D, 614; *Watson* v. *Dilts,* 116 Iowa 249, 89 N. W. 1068, 57 L. R. A. 559, 93 Am. St. Rep. 239; *Kurpgeweit* v. *Kirby,* 88 Neb. 72, 129 N. W. 177, 35 L. R. A. (N. S.) 98.

In *May* v. *Western Union Tel. Co., supra,* the action was for trespass on land. The facts were that the right of way of the Southern Railway Company ran in close proximity to the land of the plaintiff and that the defendant company had permission from the railway company to go upon its right of way and remove certain telegraph poles; "that the servants of the defendant during the day in question, and while on the premises of John May engaged in the work already described, indulged in loud, profane, and boisterous language, and sang lewd and vulgar songs, to the terror of the *feme* plaintiff and others in the house; that they invaded the house, and at one time seized a guitar which was there, and played on it, and sang ribald songs; that Stern, defendant's principal foreman in charge of said crews, went to the well near by, and, facing the open door of the *feme* plaintiff's bedroom, yelled at her and sang lewd and vulgar songs in her immediate presence and hearing; and that the noise and tumult, the profanity and vulgar songs of defendant's servants throughout the day, and while engaged in moving the poles in question, were so great, loud, and boisterous as to be heard by many people in the neighborhood;" that two of the foremen before beginning the work had been warned by the plaintiff's husband "of the bad and precarious health of his wife, and that she was in the house, and asked them not to go upon the property * * *"; upon which one of the foremen replied that he was ordered to do the work and he intended to do it regardless of "any other man's wife and he did not 'give a damn.' " The *feme* plaintiff became unconscious from fright and suffered permanent injury to her health. It was held that the jury might con-

sider the fright resulting in physical injury in aggravation of damages.

In *Jeppsen* v. *Jensen, supra,* the facts were that defendant, about eight-thirty, p. m., knocked at the door and when plaintiff opened it entered the room in which she, her husband and her children were and began to abuse her husband; drew a pistol from his pocket and pointed it over and across plaintiff's shoulder and threatened to shoot and kill her husband. Defendant was repeatedly requested to leave, the premises; he used vile and threatening language; finally he was persuaded to leave but returned a second time and force was required to prevent his entrance. At the time plaintiff, with knowledge of defendant, was in delicate health, and the assault upon her husband so frightened her that she fainted and her nervous system was seriously affected. The court held that where the wrongful act is occasioned by offensive, insulting and humiliating conduct, or where the act itself is wilful and inhuman, recovery may be had for fright and its physical consequences.

In that case it was contended that the defendant went to the home of the plaintiff for a lawful purpose and that he was rightfully there. Speaking to the point the court said: "Let this be conceded. That, however, gave him no right to commit an unlawful act after he had arrived there. Suppose one goes to his neighbor upon a mission of mercy, but before he leaves the premises he commits an assault. Is he any the less culpable or responsible for his conduct? We are of the opinion, therefore, that the acts described in the complaint are such as bring this case clearly within the rule that damages may be recovered for injuries to health or for shock to the nervous system, although caused by terror or fright alone, and where there was no actual bodily injury inflicted upon the injured person and none such intended by the wrongdoer. Such acts cannot be considered as merely ordinary negligent acts, for which no recovery from (for) fright alone is, as a general rule, permitted."

In each of the above mentioned cases the evidence established or the complaint alleged that the defendant was guilty of either a wilful trespass or of a threat of personal violence with apparent ability to carry out the threat, and that the fright of plaintiff was the natural and probable consequence of the wrongful act. More recent cases, not cited in the briefs, are *Comstock* v. *Wilson*, 257 N. Y. 231, 177 N. E. 431, 76 A. L. R. 676; *Hanford* v. *Omaha & C. B. Street Ry. Co.*, 113 Neb. 423, 203 N. W. 643, 40 A. L. R. 970; *Rogers* v. *Williard*, 144 Ark. 587, 223 S. W. 15, 11 A. L. R. 1115; *Lambert* v. *Brewster*, 97 W. Va. 124, 125 S. E. 244.

It is now a well accepted fact that terror or a severe mental shock may be the direct and proximate cause of wreck to the nervous system, the consequence of which may be a visible physical injury. When such fright is due to a wilful, wanton and vindictive wrong, recovery is generally permitted, notwithstanding the fact that there is no contemporaneous injury from without. This is the rule even in Pennsylvania, where the court has consistently denied recovery for such injury occasioned by mere negligence. See an interesting article on "Liability in Pennsylvania for Physical Effects of Fright," in University of Pennsylvania Law Review, March, 1932.

The determination in each case is governed by its own particular facts. It is elementary that the plaintiff must prove by a preponderance of the evidence the causal connection between the tort and the injury.

In the instant case the evidence on this point consists of the testimony of five physicians. All agree that the physical condition of plaintiff was the result of a second stroke of paralysis, and that any person who has suffered one stroke will in all probability suffer a recurrence, with or without known causes, and that the second stroke may be due to various circumstances and conditions. Two of these experts stated that the interview with defendant was a coincidence; that the plaintiff would have had the attack if she had never had an interview with defendant. Two of the others state

that it is possible, and one adds that it is probable, that the paralytic stroke was not due to any act of defendant. The three who testified for plaintiff base their conclusion upon the statement of plaintiff and her husband that she had had "a terrible fright," and one of the experts, who has the reputation of being a professional witness, undertook to tell in detail what the plaintiff and her husband prior to the trial had told him of defendant's conduct and words during both interviews with defendant, which differs materially from their evidence in this case.

The conclusion of these experts is based on the assumption that plaintiff received a terrible fright, or a mental shock so severe as to cause nervous trauma. The link in the chain of causation establishing the terrible fright or mental shock is the testimony of plaintiff and her husband regarding the two interviews with defendant. From the evidence already analyzed, it appears to us unreasonable to conclude that a terrible fright or severe mental shock to plaintiff was the natural and probable consequence of the defendant's interviews with her.

This case, which is the first of the kind to reach this court, falls within a class which is not favored. While the possible success of unrighteous or groundless actions should not bar recovery in a meritorious case, nevertheless, because of the fact that fright or mental shock may be so easily feigned without detection, the court should allow no recovery in a doubtful case. The plaintiff should be required to prove by clear and convincing evidence, (1) the commission of the wrongful act, and (2) a chain of unbroken causal connection between the alleged act and the physical injury.

For the reasons stated, the verdict of the jury is set aside, the judgment reversed, and the case dismissed.

*Reversed.*