**Mary Elizabeth Humphreys FERRELL, Plaintiff,**

**v.**

**CHESAPEAKE & OHIO RAILWAY EMPLOYEES HOSPITAL ASSOCIATION et al. Defendants.**

**Civ. A. No. 70-C-104-R.**

United States District Court,
W. D. Virginia,
Roanoke Division.

Nov. 23, 1971.

Arthur E. Koch, III, Pulaski, Va., and Wade H. Ballard, III, Peterstown, W. Va., for plaintiff.

William B. Poff, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for C&O Railway Employees Hospital Assn. and Melvin Antonio, M.D.

William T. Wilson, Collins & Wilson, Covington, Va., for Murdo M. MacKay.

S. D. Roberts Moore, Gentry, Locke, Rakes & Moore, Roanoke, Va., for Charles F. Ballou, III.

Kenneth E. Trabue, Hunter, Fox & Trabue, Roanoke, Va., for Stuart H. Harris, Jr., M.D.

## OPINION and JUDGMENT

DALTON, District Judge.

Mary Elizabeth Humphreys Ferrell, a resident of the State of West Virginia, instituted this action against the Chesapeake & Ohio Railway Employees Hospital Association and four doctors associated with that institution, on August 26, 1970. Her original complaint alleged two causes of action against the defendants. The first cause of action charged that the defendants negligently and carelessly failed and refused to remove a chicken bone from the throat of her husband, Thomas Cecil Ferrell, and that they negligently and carelessly diagnosed her husband as suffering from delirium tremens. She further alleged that as a direct and proximate cause of the defendants' negligence and carelessness, she was subjected to unnecessary humiliation and embarrassment by having her husband diagnosed as an alcoholic; and she suffered unspeakable mental anguish witnessing the painful and agonizing demise of her husband for lack of proper medical treatment and attention. The second cause of action in the plaintiff's original complaint alleged that the defendants breached their duty to render proper medical care to her husband and that they fraudulently and deceitfully represented to her that her husband had passed the chicken bone from his throat when in fact the chicken bone remained lodged in his esophagus.

On December 15, 1970, this court following a motion to dismiss filed by the defendants ruled that the plaintiff's first cause of action should be dismissed on the grounds that her alleged mental anguish was not accompanied by any actionable injury on her part, and that the court could find no basis in Virginia law for awarding damages for humiliation suffered as a result of a negligent diagnosis of delirium tremens. Ferrell v. Chesapeake & Ohio Railway Employees Hospital Association, (December 15, 1970).

The plaintiff's second cause of action based on her claim that the defendants breached their duty to render proper medical care to her husband was allowed by this court as against the C&O Hospital and Dr. Murdo M. MacKay, but was dismissed as to the other defendants.

As to that second cause of action this court ruled that damages for mental anguish were recoverable in an action for breach of contract to render proper medical care to one's spouse since failure to do so would reasonably result in mental suffering by the contracting spouse. However, this court further stressed that in order to recover under her second cause of action, the plaintiff would have to prove more than a mere request by her for the defendants to render medical treatment to her husband. It was held that she would have to prove that she did indeed contract with the defendants for their services and that the defendants looked to her rather than her husband or his estate for payment. This court further stated that the defendants must have been aware that they were assuming duties to more than one person.

On January 13, 1971, this court by order allowed the plaintiff to amend her tort claim. Thereafter the plaintiff filed an amended complaint in which she amended her first cause of action to allege that the defendants' conduct had been wilful and wanton instead of negligent and careless.

By agreement of the parties, the case has now been submitted to the court to decide not only the points of law but also to decide the merits of the case.

The first determination which this court must make is whether the plaintiff's amended complaint states a cause of action on which relief can be granted. The plaintiff alleges that she took her husband to the C&O Hospital for removal of a chicken bone lodged in his esophagus. She alleges that the defendants knew that the chicken bone was lodged in his esophagus but that they wilfully and wantonly refused to accept the fact that the said Thomas Cecil Ferrell had a chicken bone lodged in his esophagus and that they wilfully and wantonly diagnosed that Thomas Cecil Ferrell was suffering from delirium tremens and placed him in a restraining jacket. As a direct and proximate cause of the defendants' wilful and wanton negligence and the failure to remove the chicken bone, the plaintiff alleges that Thomas Cecil Ferrell died at the hospital on March 7, 1969. The plaintiff alleges that as a direct and proximate cause of the defendants' wilful and wanton mistreatment of her husband, she suffered unspeakable mental anguish witnessing the painful and agonizing demise of her husband. She also alleges that she suffered unnecessary humiliation and embarrassment by having her husband diagnosed as an alcoholic.

In determining whether a complaint states a cause of action upon which relief can be granted, this court must consider all allegations by the plaintiff as true. Doing this in the case at bar, this court must decide whether a wife can maintain an action in tort for emotional distress resulting from the intentional mistreatment of her husband by the defendants.

 Traditionally, the ability to recover damages for emotional distress has been limited to cases in which the plaintiff also suffered a contemporaneous physical injury. However, the trend in recent years has been to allow recovery for emotional distress which results from wilful, wanton, intentional, or vindictive conduct. Prosser, Law of Torts § 12 (4th ed. 1971). According to Professor Prosser, the rule which seems to have emerged is that there is liability for conduct, exceeding all bounds tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. Prosser, supra, at p. 56. Under the law of Virginia, a contemporaneous physical injury is no longer a prerequisite to recovery for emotional distress, when this distress is due to a wilful, wanton and vindictive wrong. Moore v. Jefferson Hospital, Inc., 208 Va. 438, 441, 158 S.E.2d 124, 127 (1967); Bowles v. May, 159 Va. 419, 437, 166 S.E. 550, 556 (1932). Of course, the plaintiff must prove by a preponderance of the evidence the causal connection between the tort and the injury. *Bowles*, supra, 159 Va. at 437, 166 S.E. at 556. Fur-

thermore, the emotional distress must exist, it must be severe, and it must cause an illness or other bodily harm. *Moore*, supra, 208 Va. at 442, 158 S.E.2d at 127; Prosser, supra, at p. 59.

It has also been held that a wilful, wanton, intentional, or vindictive act against a third party which causes emotional distress to another may, under some circumstances, be actionable. In the case at bar, the alleged wilful and wanton conduct was against the plaintiff's husband rather than against the plaintiff. According to Professor Prosser, the conduct against the third party must be of such a nature that there is a high degree of probability that the mental disturbance would follow, and the defendant must have proceeded in conscious and deliberate disregard of it. Prosser, supra, at p. 61. In Moore v. Jefferson Hospital, Inc., supra, the Virginia Supreme Court of Appeals cited the following passage from the Restatement (2d) of Torts § 312 (1965) with apparent approval:

> If the actor intentionally and unreasonably subjects another to emotional distress which he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for an illness or other bodily harm of which the distress is the legal cause,
>
> (a) although the actor has no intention of inflicting such harm, and
>
> (b) *irrespective of whether the act is directed against the other or a third person.* (emphasis added)

208 Va. at 442, 158 S.E.2d at 127.

■ It therefore appears that under the law of Virginia, emotional distress which is directly and proximately caused by wilful, wanton, intentional, or vindictive conduct against a third person may create a cause of action in tort when the emotional distress is a foreseeable result of the wilful and wanton act. However, in measuring the foreseeability, one factor which must exist is a close relationship between the person suffering the emotional distress and the person against whom the wilful and wanton act is directed. Perhaps these possible plaintiffs would only include members of the third person's immediate family. Prosser, supra, at p. 61.

■ It therefore appears to this court that the plaintiff in the case at bar has stated a cause of action upon which relief could be granted. This court feels that the wilful and wanton mistreatment of a patient by doctors could directly and proximately cause foreseeable emotional distress to that patient's wife.

In order for the plaintiff to prevail on the cause of action just discussed, this court must find from the evidence that the treatment of the plaintiff's husband by the defendants constituted wilful, wanton, intentional, or vindictive conduct, and if such conduct is found to have occurred then this court must find that the plaintiff suffered actual emotional distress as a direct and proximate cause thereof.

The facts reveal that on February 26, 1969, the plaintiff's husband swallowed what he thought was a chicken bone while eating dinner with his family. The plaintiff took him to the Greenbriar Valley Hospital located in or around Lewisburg, West Virginia where he was examined by Dr. Paul E. Prillaman, Jr., a board-certified general and thoracic surgeon. Mr. Ferrell complained of discomfort in his neck as a result of swallowing a chicken bone. Dr. Prillaman conducted a laryngoscope of Mr. Ferrell's larynx and esophagus, but was unable to find any definite foreign body at that time. Dr. Prillaman could get only a brief glimpse of the patient's throat because Mr. Ferrell would not cooperate with him in the examination. Dr. Prillaman also attempted to obtain an x-ray of a barium swallowing but Mr. Ferrell would not swallow enough liquid to enable him to perform an adequate examination. Dr. Prillaman stated that Mr. Ferrell was uncooperative, irrational and seemed at times to be hallucinating. Not considering the ailment to be an

emergency, Dr. Prillaman instructed Mrs. Ferrell to bring her husband back in the morning at which time he hoped he could get a satisfactory barium swallow.

Mrs. Ferrell took her husband home, but feeling that he was suffering severe pain and discomfort, she attempted to contact Dr. Millman, her family physician. Dr. Millman could not be located, so she or her sister called the C&O Hospital in Clifton Forge, Virginia to determine if someone there could see her husband. She was told to bring him over that night, which she did, arriving at the hospital at approximately 11:30 p. m. Mr. Ferrell was examined in the C&O emergency room by Dr. Melvin Antonio, one of the defendants in this action. Dr. Antonio was unable to establish that there was a chicken bone in Mr. Ferrell's throat, and since he was of the opinion that there was no immediate danger, he instructed Mrs. Ferrell to bring her husband back to the C&O Hospital at nine o'clock the next morning. At the request of Mrs. Ferrell, Dr. Antonio instructed the nurse to give Mr. Ferrell a shot and some pills to help calm him down. This was the only contact which Dr. Antonio had with Mr. Ferrell. This court does not find in the evidence any facts which would support a finding that Dr. Antonio's conduct was wilful or wanton. He like Dr. Prillaman of the Greenbriar Valley Hospital did not deem the chicken bone ailment as an emergency.

Thereafter, Mrs. Ferrell and her husband returned to West Virginia. According to Mrs. Ferrell, her husband had a very restful night. The next morning Mrs. Ferrell did not return to the C&O Hospital at nine o'clock as requested by Dr. Antonio, instead she went to see Dr. Millman, her family physician, who called the C&O Hospital and arranged to have her husband treated. Dr. Millman was told that Dr. Stuart H. Harris, Jr., a thoracic surgeon from Lynchburg and a defendant in this case, would be there. Mrs. Ferrell and her husband arrived at the C&O Hospital at approximately 11:15 a. m. and were directed to the fifth floor where Mrs. Ferrell gave the nurse the emergency slip from Dr. Millman. The nurse instructed Mrs. Ferrell and her husband to have a seat in the waiting room. Apparently, Dr. Harris was unable to see Mr. Ferrell until three o'clock that afternoon because he was performing two operations on other patients. Mrs. Ferrell said that because of this three and a half hour wait her husband became extremely upset and angry. Dr. Harris did examine Mr. Ferrell and attempted a bronchoscopy but was unable to make a diagnosis because Mr. Ferrell would not cooperate and was confused. He told Mrs. Ferrell that he was going to have her husband admitted to the hospital and would call Dr. Murdo M. MacKay, an ear, nose and throat specialist in Clifton Forge, about handling her husband's case because he had an appointment in Lynchburg at four o'clock. This was the only contact which Dr. Harris had with Mr. Ferrell. The plaintiff contends that to make her husband wait three and a half hours was wilful and wanton conduct on the part of Dr. Harris in light of the emergency condition of her husband. While this court feels that Mr. Ferrell was suffering pain and discomfort which was aggravated by the delay, it does not find that Mr. Ferrell's condition was of a nature which required immediate emergency treatment. Likewise, this court does not find that the failure of Dr. Harris to leave his other patients, who were undergoing surgery, in order to treat Mr. Ferrell constituted wilful and wanton conduct.

After Dr. Harris's examination, Mr. Ferrell was admitted to the hospital at 2:55 p. m. as a patient of Dr. MacKay. The hospital records reveal that the results of a physical examination showed that Mr. Ferrell appeared to be suffering from delirium tremens which made a full examination difficult. This report of February 27, 1969 also showed that the family stated that they were unaware of excessive use of alcohol by Mr. Ferrell. The diagnosis recorded on Mr.

Ferrell's hospital admission sheet was "chicken bone in throat, bilateral bronchopneumonia."

The C&O Hospital nurse's record shows that Mr. Ferrell was brought to his room in a wheelchair at 3:15 p. m. on February 27, 1969 and that Dr. MacKay visited him around fifteen minutes later. The nurse's notation at that time showed that Mr. Ferrell appeared very confused and disoriented and that 30 mgm. of Probanthine, a relaxant, was administered to reduce muscle spasm in the throat. Apparently Mrs. Ferrell returned to her home around 4:30 p. m. At 4:45 p. m., 25 mgm. of Sparine was administered for restlessness and confusion. At 5:45 p. m., Mr. Ferrell broke restraints, and according to the nurse's record he was confused, uncooperative and unmanageable. It was at this time that Mr. Ferrell was placed in a restraining sheet. Dr. MacKay was in to see the patient at 7:15 p. m. on that day.

Dr. Charles F. Ballou, III, also a defendant in this action, was called in by Dr. MacKay as a consultant on Mr. Ferrell's case on the day of his admission. Dr. Ballou's specialty was internal medicine with a sub-specialty in pulmonary diseases, and he was asked to evaluate Mr. Ferrell's overall condition. He saw the patient within a few hours after his admission to investigate the possibility of delirium tremens. While Mr. Ferrell was in the hospital, Dr. Ballou directed the treatment of him with respect to his overall body functions.

This court has examined the medical records covering the treatment of Mr. Ferrell until his death and does not feel that it is necessary to recite in detail the remaining notations in those records. Examination of these medical records reveals that Mr. Ferrell's condition apparently never stabilized and he remained confused and unmanageable. During the week, Dr. MacKay consulted with Mrs. Ferrell and other members of the family about Mr. Ferrell. Mrs. Ferrell insisted that the diagnosis of delirium tremens was incorrect.

An X-ray of the patient's throat on the day of his admission indicated that there was a foreign object lodged in his esophagus; however, on the basis of an X-ray taken about a week later, Dr. MacKay told Mrs. Ferrell that the bone had apparently passed. In fact, the pathological report issued after Mr. Ferrell's death revealed that a small chicken bone did remain in his throat. However, on the death certificate the causes of death were listed as "(A) Bilateral bronchopneumonia (B) Cerebral edema (C) Acute schizophrenia." The evidence reveals that Dr. MacKay was first informed of Mr. Ferrell's prior mental history around Wednesday or Thursday of the week following Mr. Ferrell's admission. This prior medical history revealed that Mr. Ferrell had visited Greenbriar Clinic and St. Albans Hospital in Radford, Virginia for psychiatric examinations. The diagnosis from each of these institutions revealed that Mr. Ferrell suffered from schizophrenia and also that there was history of excessive use of alcohol. Testimony by children of Mr. Ferrell indicates that Mrs. Ferrell made statements about Mr. Ferrell's alcoholism at times while he was in the C&O Hospital.

In light of Mr. Ferrell's unstable physical and mental condition following his admision to the C&O Hospital, Dr. MacKay and Dr. Ballou did not recommend surgery to remove the chicken bone. They did not regard the chicken bone as a danger to Mr. Ferrell's life at that time. It appears to this court that this action was proper on the part of these two defendants.

■■ Upon examination of the evidence in this case, this court is unable to find any acts on the part of any of the defendants which constituted wilful, wanton, intentional, or vindictive conduct.

As to the plaintiff's second cause of action alleging breach of contract to perform proper medical treatment by the C&O Hospital and Dr. MacKay, this court fails to find that the treatment administered to Mr. Ferrell was improper,

but under the circumstances discussed herein that treatment is deemed to have been proper.

For the reasons herein discussed the court hereby enters judgment for the defendants on all counts of the complaint, and each party shall bear his own costs.