## PATRICIA ANN WILSON RUTH

### V.

## HARRY THEODORE FLETCHER

Record No. 860965

March 3, 1989

Present: All the Justices

*Alan Rosenblum (David Rosenblum; Rosenblum & Rosenblum*, on brief), for appellant.
*Nancy Blair Viccellio* for appellee.

THOMAS, J., delivered the opinion of the Court.

The central issue in this appeal is whether Harry Theodore Fletcher (Ted), successfully proved a case of intentional infliction of emotional distress against Patricia Ann Wilson Ruth (Patty). Ted alleged that Patty intentionally convinced him that she was pregnant with his child; that she fostered the development of a bond of love and affection between Ted and the child; that she caused Ted to pay monthly child support in return for visitation rights; that she persuaded Ted's parents that the child was their grandchild; and that when it suited Patty's purposes, she cut off Ted's visitation rights and proved that he was *not* the child's father, thus, causing Ted severe emotional distress. The case was tried to a jury which returned a $35,000 verdict in Ted's favor, upon which judgment was entered.

The proper disposition of this case is controlled by our decision in *Womack* v. *Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974). There, we recognized for the first time in Virginia a cause of action for intentional infliction of emotional distress unaccompanied by physical injury. We set forth the elements of the tort in the following language:

> We adopt the view that a cause of action will lie for emotional distress, unaccompanied by physical injury, provided four elements are shown: *One*, the wrongdoer's *conduct was*

*intentional or reckless.* This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. *Two,* the *conduct was outrageousand intolerable* in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. *Three,* there was a *causal connection between the wrongdoer's conduct and the emotional distress. Four,* the emotional *distress was severe.*

*Id.* at 342, 210 S.E.2d at 148 (emphasis added). Further, we pointed out in *Womack* that it was for the court to determine in the first instance whether the conduct complained of could reasonably be regarded as so extreme and outrageous as to permit recovery. *Id.*

Having stated the guiding legal principles, we set forth the facts in the light most favorable to Ted, who prevailed at trial. Ted and Patty met in late 1979 or early 1980. They dated frequently and developed a relationship which involved frequent sexual relations. They maintained their separate residences; his in the District of Columbia, hers in northern Virginia.

They engaged in sexual relations in the first part of September 1980. During that same time period, and within "three, four [or] five" days of engaging in sexual relations with Ted, Patty also engaged in sexual relations with a bartender who worked at a nightclub where Patty worked as a waitress. In October, Patty learned she was pregnant. Her first thought was that the bartender was the father. She met with him, advised him of her pregnancy, told him she wanted to get an abortion, and asked him for money. He said he would give her money when he got paid the following week.

During the next week, Patty thought the matter over, concluded that the child might be Ted's, and decided to keep the baby. When she called the bartender to advise him that she had changed her mind and did not need money from him for an abortion she found that his phone was disconnected and that he was nowhere to be found. She concluded that the bartender had taken

a "hike" because he did not want to be involved with the situation.

In late October or early November 1980, Patty told Ted she was pregnant. He asked her whether there was a possibility that the child was not his. She admitted that she had engaged in a single sexual encounter with the bartender. She assured Ted, however, that based on what her doctor had told her about how far her pregnancy had advanced and based on her own calendar, she had determined to her own satisfaction that the child was Ted's. She told Ted that she had made that determination because the probable date of conception was one of the dates in September on which they had had sexual relations.

Patty told Ted's parents that she was going to make them grandparents. She also told mutual friends of Ted and hers that she was carrying Ted's child. She asked Ted to help her by giving her both emotional and financial support. She asked him to attend "Lamaze" childbirth classes with her, to be her childbirth "coach," and to be present when the child was born.

Although initially he did not provide financial support, Ted did most of the other things Patty asked of him. He attended the childbirth classes. At his urging, she decided not to have the child in Virginia, but to have it at George Washington University Hospital in Washington, D.C., which was directly across the street from Ted's apartment. Two weeks before the due date of June 13, 1981, at Ted's urging, Patty moved into his apartment so they could be close to the hospital and ready to go at a moments notice. They agreed upon a first name for the baby.

On June 13, 1981, precisely as predicted, Patty went into labor and the two walked across the street to the hospital. A boy was born that day. Ted stayed with Patty throughout labor and delivery. After the child was born, Ted went out in the hall, with tears in his eyes, to advise his mother who had waited at the hospital with him. He also allowed his name to be placed on the birth certificate as the baby's father. Later that day, Ted went into the hospital nursery to hold the baby.

The next day when Ted visited the nursery, he noticed that the baby had an "I.V." tube in its arm. When he asked why, he was told that Patty had had a fever at the time the child was born and that the baby had an elevated white blood cell count. Ted became alarmed because he associated an elevated white blood cell count with leukemia. Ted discussed the matter with the doctor, who ex-

plained that a high white blood cell count sometimes occurred when there was a significant difference in blood type between the mother and child.

The doctor explained further that Patty's blood was type "B" while the baby's blood was type "O." This revelation caught Ted off guard because he knew his own blood was type "A." The doctor recognized the concern in Ted's face and explained "dominant and recessive" blood type characteristics. He said that Patty was type "B" dominant, type "O" recessive, and that one of Ted's parents must have been type "O" in order for the baby to be type "O." Ted called his mother who told him that she was type "A," but that Ted's father was type "O." This answer satisfied Ted.

Ted then talked with Patty about the baby's "I.V." and the blood type information. Patty became angry, because she thought Ted, in an effort to determine whether the child was his, had gone behind her back to check on the child's blood type. She stated to Ted: "[He] is your child. I don't want — I'm not happy about the fact that you have asked for a blood type as if to imply that you are not sure he's your child. He is your child and that's the end of that."

Shortly after the baby was born, Ted's father decided to establish a trust fund for the child. Ted's mother urged Ted to take a definitive blood test to be sure the child was his. Ted told his mother he would ask Patty about it. When he did, Patty said "[a]bsolutely not. This is the second time this has come up. I don't want to hear another word of it. He's your child." Patty threw a tantrum and told Ted "I don't want you ever to bring the topic up again. I'm tired of hearing it.. I'm tired of this, that and the other."

Patty left the hospital and moved in with her parents. Her parents did not welcome Ted because he was not providing financial support to their daughter. For eight to nine months after the child was born, Ted did not provide financial support. He did talk with Patty on the phone and would come to visit on occasion.

In February 1982, Patty asked Ted for $200 per month in financial support. In return, he asked for visitation rights every other weekend. Patty complained that this was too frequent. Ted replied that perhaps $200 per month was too much money. Patty responded by saying she wanted $200 per month and that if Ted did not provide it, she could take him to court to get it and might possibly get more than $200 per month. She called later to apolo-

gize and agreed to the visitation he had requested, so long as he paid the $200 per month. Ted began making such payments in March 1982. He continued the payments until June 1985.

As the child grew older, Patty noticed that he did not share any physical similarities with Ted. In 1983, Patty had a chance encounter with the bartender and noticed that her son looked remarkably like the bartender. She began to have doubts about whether Ted was her son's father but she never expressed those doubts to Ted.

In the meantime, a deep, loving relationship grew between Ted and the child. On his weekend visitations, Ted would take the child to Ted's mother's home where she would read him books. The child liked trains. Ted took him on train rides and decorated a room at Ted's apartment with trains. On occasion, Patty would ask Ted's mother to baby-sit "her grandson." The child called Ted "daddy" and would spontaneously hug Ted and tell him, "I love you, daddy." Ted, his brother, and his parents all became attached to the child.

Patty married Michael Ruth in July 1984. In September or October of that year, Patty advised Ted that she and her husband did not need his monthly support payments any longer. Ted said he did not want to stop making the payments because he did not know what effect that might have on his legal rights to the child, so he continued to pay.

Sometime in 1984, Ted started dating Irene Kennedy, whom he married in 1986. In June 1985, Irene met with Patty to plan a vacation trip involving Ted, Irene, and the child. In that conversation, Patty asked Irene how she thought Ted would react if her husband, Michael, wanted to adopt the child. Irene replied that Ted would be "vehemently opposed," and would not give his consent. Patty asked Irene not to tell Ted of the discussion since Patty and her husband had not yet made up their minds about the adoption.

On June 27, 1985, Patty told Ted that she was stopping visitation, that Ted would not be allowed to see the child again, and that she and her husband were filing for adoption. Ted refused to give his consent. He said he would fight for the legal right to see the child.

Patty and her husband, Michael, initiated adoption proceedings in July 1985. Patty filed affidavits in which she stated that Ted was not the child's father but that the bartender was. Within the

confines of that proceeding, at Ted's request, a Human Leukocyte Antigen (HLA) test was performed which proved that Ted was not the child's father, but that the bartender was. Ted's visitation rights were terminated by court order.

Ted was asked whether he thought Patty had told him he was the father of the child in order deliberately to hurt him. He replied, "I don't think so, not deliberately to hurt me." He also said that when she called to advise him of the adoption, she was crying. As she talked to him, she asked him why he was not yelling and screaming. He replied, "Because I can hear in your voice, Patty, this is the hardest thing you have ever done." According to Ted, she answered "You are right. You are absolutely right."

On the basis of the foregoing facts, Patty was found liable for intentional infliction of emotional distress. In our opinion, these facts are insufficient to prove the cause of action.

The tort alleged by Ted in this case has its historical antecedents in *Bowles* v. *May*, 159 Va. 419, 166 S.E. 550 (1932), where this Court first recognized that there could be liability in tort for a nontactile wrong which resulted in physical injury. There, the allegation was that the defendant threatened the plaintiff, thus causing fright and mental shock which resulted in a stroke. In *Bowles*, we reversed a jury verdict in favor of the plaintiff on the dual grounds that (1) the defendant's statement had been protected by a qualified privilege, and that (2) there was no proof of an unbroken causal connection between the alleged wrong and the resulting physical injury. 159 Va. at 433, 438, 166 S.E. 555, 557.

Though the facts in *Bowles* differ from those in the instant appeal, the caution we sounded there about the evolution of torts involving mental and emotional distress remains pertinent today. We pointed out that in cases where recovery was sought for mental anguish and suffering caused by negligence unaccompanied by physical injuries,

> [t]he injuries in such cases are too hard to determine with any reasonable certainty — are more often assumed than real — and the suit too liable to be wholly speculative. If everyone was allowed damages for injuries to his feelings caused by someone else, the chief business of mankind might be fighting each other in the courts. Damages for mental suffering open into a field without boundaries, and there is no

principle by which the court can limit the amount of damages.

*Id.* at 433-434, 166 S.E. at 555.

■ Because of the risks inherent in torts where injury to the mind or emotions is claimed, we declared such torts "not favored" in the law. *Id.* at 438, 166 S.E. at 557. We added that "because of the fact that fright or mental shock may be so easily feigned without detection, *the court should allow no recovery in a doubtful case.*" *Id.* (Emphasis added.) We stated that, as a further precaution, plaintiff must be required to prove such a case by clear and convincing evidence. *Bowles* marked the acceptance by this Court of the proposition that a cause of action existed where negligently caused terror or severe mental shock resulted in actual physical injury. *See Hughes* v. *Moore*, 214 Va. 27, 31, 197 S.E.2d 214, 217 (1973).

■ In *Hughes*, we added to the law concerning torts based on mental and emotional distress when we held that there could be recovery for negligently inflicted emotional disturbance *and* physical injury resulting therefrom, in the absence of physical impact where plaintiff proved by clear and convincing evidence that the physical injury was the natural result of the fright or shock. We couched that holding within various caveats to make clear that it was to be tightly controlled by the courts. *Id.* at 34-35, 197 S.E.2d at 219-220.

Finally, in *Womack* we held that there could be a recovery in a case of the kind alleged by Ted. But, even as we set forth the four elements of the tort, we were careful to add limiting language. 215 Va. at 338, 210 S.E.2d at 148. In our opinion, the strict limitations laid down in *Womack* were not adhered to in this case.

■ We fail to discern from this record any proof that Patty's conduct was "intentional or reckless." There is no proof that she set out to convince Ted that the child was his, and, to cause him to develop a loving relationship with the child so that in the end, she could hurt Ted by taking the child away from him forever. Such proof was required to satisfy the "intentional or reckless" prong of the *Womack* test. *Id.* Therefore, we hold that the trial court erred in entering judgment in favor of the plaintiff. In light of this, we will reverse the judgment of the trial court and enter judgment here in favor of the defendant.

*Reversed and final judgment.*