PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Carrico, S.J.

ABIGAIL EDEN, ET AL.

v. Record No. 021567     OPINION BY JUSTICE ELIZABETH B. LACY
                                       April 17, 2003
YVONNE D. WEIGHT, ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Leslie M. Alden, Judge

Abigail Eden and Paul Shriver, co-administrators of the
Estate of Sara B. Shriver, seek reversal of the trial court's
action setting aside a jury verdict in their favor and
entering judgment in favor of Yvonne D. Weight and Mark J.
Caraluzzi. The co-administrators filed an amended bill of
complaint alleging that they were damaged as a result of their
reliance upon false representations of material fact made by
Weight and Caraluzzi regarding the sale of certain stock held
by the Estate. Following a two-day trial, the jury returned a
verdict finding that Weight and Caraluzzi had engaged in
constructive fraud and awarding the co-administrators a total
of $156,000 in damages.

Weight and Caraluzzi filed motions to set aside the
verdict which the trial court granted, holding that there was
no evidence that, after July 15, 1996, the co-administrators
acted to their detriment in reliance on the misrepresentations
of Weight and Caraluzzi and no evidence that the co-
administrators suffered any damage prior to July 15, 1996.

Because we conclude that the record in this case supports the trial court's action in setting aside the jury verdict, we will affirm the judgment of the trial court.

## FACTS

In reviewing whether a trial court erred in setting aside a jury verdict, we apply well-established principles. We consider the evidence in the light most favorable to the party in whose favor the verdict was rendered and, if there is any evidence in the record to support the jury's verdict, we must reinstate that verdict. Simmons v. Miller, 261 Va. 561, 572, 544 S.E.2d 666, 673 (2001).

Sara Shriver was an original investor in, and member of the Board of Directors of Shirlington Cuisine, Inc. (SCI or the Corporation), a corporation engaged in the restaurant business. At the time of her death in 1995, SCI operated one restaurant called Bistro Bistro and a second restaurant was scheduled to open in November 1995 in Reston. The Corporation was also negotiating for the purchase of a third restaurant in Ballston. Sara Shriver died intestate on September 15, 1995, survived by six adult children, including Abigail Eden and Paul Shriver. Sara Shriver's 140 shares of SCI stock were included in the Estate. Following her funeral, the children discussed the administration of the decedent's Estate with Weight, an SCI shareholder and member of the Corporation's

2

Board of Directors.  Weight was also an attorney and personal friend of Sara Shriver.  Weight told the heirs that there were some restrictions on the sale of the SCI stock because the Corporation had Subchapter S status for purposes of state and federal income taxation purposes.  She also told the heirs that disposition of the stock might be restricted by a shareholders' agreement which she suggested they would find among Sara Shriver's papers.

The heirs met again in December and designated Shriver and Eden as co-administrators of the Estate.  They also decided to sell the SCI stock.  They had "no sense of urgency" and planned on selling the stock sometime in the second quarter of 1996.  Although they had not located a shareholders' agreement or otherwise determined what restrictions might apply to disposition of the stock, the heirs believed that they could not distribute the stock among themselves and that the sale of the stock was restricted based on the information previously given to them by Weight.

In March 1996, Shriver contacted Caraluzzi seeking help and information regarding the value of the stock and the ability of the Estate to sell the SCI stock.  Based on the information in Sara Shriver's files, Eden knew that the stock had been valued at $250 a share in the past, but because of the size and regularity of the dividends paid by the

Corporation, Eden believed the stock was worth more than $250. Caraluzzi told Shriver that SCI would like to buy the Estate's shares but suggested that Shriver and the Estate wait until May 1996 when the SCI stock would be revalued and the value would likely increase. Caraluzzi also advised Shriver that there were limitations on the number of shareholders because of the Corporation's Subchapter S status and that, while more than one heir could hold stock, six heirs would be too many.

In April, Shriver asked Caraluzzi about the shareholders' agreement. Caraluzzi told Shriver he could pick up a copy of the agreement at Caraluzzi's office. The material Shriver received was only an unexecuted, partial shareholders' agreement, containing provisions on transfer restrictions and transfers upon a shareholder's death. After seeing this material, Shriver believed an executed copy of the full agreement existed.

In May, Shriver again asked Caraluzzi for the value of the SCI stock. Caraluzzi replied that revaluation of the stock had not yet been concluded and suggested that the Estate make SCI an offer for the purchase of the Estate's stock. Following this conversation, Shriver discussed the matter of valuation and sale of the stock with an accountant. The accountant advised that a restaurant broker would not be interested in a minority share of the restaurant. The

4

accountant also suggested that Shriver could compare the dividends the Estate had been receiving from SCI "to treasury bills in order to get some sort of a valuation." On July 2, 1996, Shriver received SCI financial information for the years 1994 and 1995. Using the accountant's suggested valuation formula, Shriver determined the SCI stock had a high value of $1,800 a share, and a low value of less than $200 per share. Shriver testified, however, that he felt he needed additional information to reach an accurate value for the stock.

Eden also contacted Caraluzzi in an attempt to determine the value of the stock. In a telephone conversation on July 2, 1996, Caraluzzi told Eden that he was meeting with an accountant and would get back to Eden with the requested information within two weeks. During that conversation, Eden made the following notations: "Meeting w/ accountant 1 wk from Monday. 'This is objective.' Sell the treasury stock. Rules are not clear."

When Eden called Caraluzzi two weeks later, Caraluzzi said he would not give Eden the stock value because the SCI Board of Directors had not yet approved the new value. Eden also requested a list of SCI's shareholders, and Caraluzzi said he would have to check with Weight before releasing the list. Following these conversations, Eden was "confused, dismayed, disappointed" and "full of suspicion."

5

On July 15, Eden sent the following electronic mail (E-mail) to her siblings:

> Thought you all would be interested in the process Paul and I worked out for the stock.
> 1.) Find out what Mark C[araluzzi] and his account think the stock is worth.
> 2.) Confirm that valuation with our own "expert" and against what we know now about valuing stock.
> 3.) Offer to sell the stock to the company outright for a lump sum payment due immediately. (They will not be able to do it because of cash flow.)
> 4.) Get the list of current syndicate members and send an offer letter. Because they already own stock, they can make an offer on all or part of the stock. . . .
> 5.) If there are no takers, sell the stock to an investor through a restaurant broker. . . .
>
> Paul is working on first draft of letter. We have requested that Mark C[araluzzi] contact us as soon as possible with the valuation. In a prior conversation, Mark indicated that he had some people outside the syndicate that might be interested. Therefore, we might add a step 4.5) to try to sell to them.

Several days later, SCI sent a memorandum to its shareholders setting up a special meeting on July 30 to allow the shareholders to see the Corporation's new Ballston restaurant and to offer 140 shares of the Corporation's treasury stock for sale at $1,450 per share. The memorandum indicated the sale of treasury stock was to raise funds to complete construction and operation of the new restaurant that the Corporation was acquiring in Ballston. The memorandum also indicated that Caraluzzi intended to contact the shareholders individually before the meeting.

6

Shriver testified that this memorandum was his first indication that SCI would be selling treasury shares. He immediately attempted to get the list of current shareholders and picked up the list from Caraluzzi's office "[n]o more than a week later." He also decided to value the stock at $1,200 a share, an amount that the co-administrators "would be willing to accept." Eden testified that when she saw the SCI memorandum on July 24, she realized that "the corporation has other interests. This is a competition. They're issuing treasury stock."

Eden telephoned Weight on July 23. In that conversation, Eden expressed her frustration with Caraluzzi, asking Weight to explain Caraluzzi's "evasiveness and the dissembling and the putting off of giving information." Weight replied that there must be some explanation because she did not believe Caraluzzi would mislead and evade them. Weight also cautioned Eden that the Estate would be "opening [itself] up for liability" if Estate stock was sold to persons other than the original shareholders or the Corporation.

On July 25, Shriver sent an E-mail to his siblings, informing them that he was preparing to sell the Estate's stock to the Corporation's existing shareholders at $1,200 per share. In asking his siblings if any of them wished to buy stock, he stated, "I know this isn't much time, but we have to

7

move quickly because of other stock arrangements going on within Bistro Bistro."

The next day, Shriver sent a memorandum to SCI's shareholders offering 126 of the Estate's shares for sale at a price of $1,200 per share. Shriver followed the memorandum with telephone calls to the persons on the shareholders' list. Two of the shareholders expressed an interest in acquiring some of the Estate's stock, and a third stated a willingness to purchase 11 shares.

Eden sent an E-mail to her siblings on July 29 regarding the Estate's stock offerings, stating in part:

> We wanted to let them know the stocks were available before they paid for the Treasury Stock just issued by the company at $1,450/share.
>
> . . . .
>
> The situation is hairy, because we are making an offer below the price offered by the company for the Treasury Stock. They are selling the Treasury Stock to bankroll construction on the new Ballston restaurant. Paul is going to attend the next meeting on Tuesday night to make sure Caraluzzi doesn't say or do anything to undermine our offer.
>
> We did this because since Paul first contacted Mark Caraluzzi he has delaye[d] and dissembled. We have run out of time and patience.

Shriver went to the shareholders' meeting on July 30. At that meeting, Caraluzzi told Shriver that he would direct the current shareholders to buy the Estate's stock and the Corporation would try to sell the treasury stock to the

outside investors.  Furthermore, if the sale to outside investors was successful, the Corporation would purchase the rest of the Estate's stock.  Shriver testified that, based on this representation, he stopped trying to market the Estate's stock to either current or new investors.

In August, Weight told Shriver that the Corporation would be changing its Subchapter S status.  Shriver, believing that the Corporation would no longer be subject to any restrictions connected with Subchapter S status, contacted his siblings in an August 6 E-mail asking if any of them wanted to purchase some of the Estate's stock.  On August 12, Shriver told Caraluzzi that "126 or 116" of the Estate's shares would be available for purchase by other shareholders or the Corporation and 24 shares would be retained by family members. Caraluzzi replied that "he should be able to sell all of those within two weeks, some of them within the next week, and that the corporation would buy any shares that the current shareholders did not buy."

On August 12, 1996, Caraluzzi issued a memorandum to the SCI shareholders offering SCI stock for sale at $1,200 per share.  On August 26, the shareholder who had indicated a willingness to purchase 11 of the Estate's shares informed Shriver by letter that she no longer wished to purchase those shares.  She changed her mind because Caraluzzi told her the

Corporation was buying the Estate's shares and because of "restraints" on her, as a member of the Board of Directors. In response to this letter, Shriver contacted Caraluzzi, who explained that "it would be simpler" if the Corporation sold shares to the current shareholders and then bought the Estate's shares "in a single block." Shriver also received a message from Caraluzzi's office in late August stating that "half the stock" was sold. In response to a request from Caraluzzi, Shriver sent a letter dated August 29, 1996 notifying Caraluzzi of the Estate's desire to sell 116 shares at $1,200 per share. The offer would remain open until November 20, but the Estate preferred that the shares be sold by September 30, 1996. Shriver received a check from the Corporation for $12,000 representing the sale of ten shares on September 26, 1996.

The Corporation sold 228 shares of its treasury stock between August and December 1996. Ninety-five shares were sold to current shareholders and fifty shares to new investors at the price of $1,200 per share between August 15 and August 28.[1] Sixty-eight shares were sold to four new investors between August 28 and September 6, 1996 at a price of $1,450 a

---

[1] The new investors were Sue Riley, an employee of the Corporation, and her mother.

share.  An existing investor purchased 15 shares at $1,650 a share in November 1996.[2]

The Corporation made no further purchases of the Estate's stock, although Caraluzzi suggested in November 1996 that the Corporation purchase the remaining 106 shares on a time payment plan "as a way to allow the Shriver's to be able to sell the stock in the near future."  This offer was not accepted by the co-administrators and no further purchases of Estate's stock were made by the Corporation, other shareholders, or outside investors.  The Corporation filed for bankruptcy in 1998.

## DISCUSSION

To prevail on a claim of constructive fraud, the co-administrators must produce evidence that Weight and Caraluzzi (the defendants) innocently or negligently made false statements of material fact upon which the co-administrators relied to their detriment.  Blair Constr. v. Weatherford, 253 Va. 343, 346, 485 S.E.2d 137, 138 (1997).  The misrepresentations must relate to a present or pre-existing fact, not statements involving promises or future events, unless the evidence shows an intent not to fulfill such promise when made.  Id. at 346-47, 485 S.E.2d at 139.  All

---

[2] Two new investors purchased 24 shares at $1,750 a share in 1997.

three elements of the cause of action, false statements negligently made, reliance, and damages, must be established by clear and convincing evidence. Id. at 346, 485 S.E.2d at 138.

In their briefs before this Court, the co-administrators succinctly stated their position on appeal as follows:

> Simply stated, plaintiffs were placed under the false impression that there were restrictions placed on disposition of the stock and that SCI was in the process of valuing that stock. Plaintiffs did not distribute the stock or sell it on their own because they thought it was impermissible to do so, and because they thought properly valuing the stock was not yet possible.

The evidence recited above shows that as of July 15, the co-administrators' actions to further the sale of the stock no longer proceeded upon a belief that there were restrictions on the sale of the stock to outside investors or that a proper value could not be put on the stock.

Eden's July 15 E-mail described a process for selling the stock that included sale to existing shareholders as well as outside investors at a price of $1,200 per share. The July 29 E-mail acknowledged that the offering price was less than the price set by the Corporation. Other statements in E-mails sent by the co-administrators and testimony at trial reflect the co-administrators' distrust of the defendants:

> [M]ake sure Caraluzzi doesn't say or do anything to undermine our offer.

12

> Caraluzzi [ ] has delaye[d] and dissembled;

> have to move quickly because of other stock
> arrangements going on within Bistro Bistro.

> realize that . . . the corporation has other
> interests.  This is a competition.  They're
> issuing treasury stock.

The plan of action created by the co-administrators on July 15 and their distrust of the defendants belie claims that the co-administrators acted in reliance on the defendants' misrepresentations after that date.  By that time, the co-administrators knew that the Estate's shares could be sold to outside investors, in addition to current shareholders, and had placed their own value on the stock at a level below the level set by the Corporation.  The co-administrators did not trust the defendants, had established a value for the SCI stock, and had created a plan for disposition of the stock both to current SCI shareholders and new investors.[3]

_____

[3] The record shows that after July 30, based on the defendants' continued statements that the Corporation would buy and would encourage current shareholders to purchase the Estate's stock, the co-administrators stopped soliciting potential purchasers.  Such promises, however, cannot form the basis of a constructive fraud claim, Blair Constr., 253 at 346-47, 485 S.E.2d at 139, and the co-administrators have stated in their brief before this Court, that their case "does not rest on a promise that SCI buy the stock from the corporation and plaintiffs' reliance on that promise or the general advice of the defendants."  Furthermore, the record shows that defendants offered to purchase the stock from the co-administrators, spreading payments for the stock over time;

Based on this record, we agree with the trial court that there is no evidence to support the co-administrators' allegations that they relied on the defendants' misrepresentations when planning and taking action necessary to sell the Estate's stock after July 15, 1996.

To the extent the co-administrators relied on the misrepresentations in deciding upon a course of action before July 15, they have failed to produce evidence of damage. The co-administrators' evidence of damage at trial was the number of shares sold between August and December 1996 and the price of those shares. Their theory was that the shares sold by the Corporation during that period at those prices "[c]ertainly would have been sold by the estate but for the actions of the defendant." None of this evidence, however, shows that any of these shares were or would have been sold prior to July 15, 1996, or at what price the shares would have sold during that time period.

For the reasons stated above, we conclude that the trial court did not err in holding that there was no evidence that the co-administrators relied upon the misrepresentations of the defendants after July 15, 1996 and no evidence of damage suffered by the co-administrators prior to that date.

---

however, the co-administrators rejected those offers, requiring a cash sale.

14

Accordingly, the judgment of the trial court setting aside the jury verdict and entering judgment in favor of the defendants is affirmed.

Affirmed.