PRESENT: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee,[1] JJ., and Russell, S.J.

SUPERVALU, INC., ET AL.

v.   Record No. 071995

JONATHAN F. JOHNSON

OPINION BY
JUSTICE BARBARA MILANO KEENAN
September 12, 2008

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

In this appeal, we consider whether the circuit court erred in refusing to set aside a jury verdict in favor of a plaintiff on claims of constructive fraud and intentional infliction of emotional distress.

## I. Procedural History

In July 2005, Jonathan F. Johnson, former owner of several grocery stores in the Richmond area, filed an amended motion for judgment in the circuit court, in his individual capacity, against SuperValu, Inc. (SuperValu), a grocery wholesaler and retailer, and its subsidiary Richfood, Inc. (Richfood). In his pleading, Johnson alleged that SuperValu and Richfood had committed actual fraud, constructive fraud, intentional infliction of emotional distress, and tortious interference with business expectancy.

---

[1] Justice Agee participated in the hearing and decision of this case prior to his retirement from the Court on June 30, 2008.

The case proceeded to a twelve-day jury trial. During the trial, SuperValu and Richfood made a motion to strike the evidence at the conclusion of Johnson's case in chief and at the end of all the evidence. The circuit court denied both motions.

The jury returned a verdict in favor of SuperValu and Richfood on the claims of actual fraud and tortious interference with business expectancy, and a verdict in favor of Johnson on the claims of constructive fraud and intentional infliction of emotional distress. The jury awarded Johnson $15,500,000 in damages on the constructive fraud claim, and $500,000 in damages on the intentional infliction of emotional distress claim.

SuperValu and Richfood filed a post-trial motion, in which SuperValu contended that the evidence was insufficient as a matter of law to support the verdict in favor of Johnson. The circuit court denied the post-trial motion and entered final judgment in accordance with the jury verdict. We awarded SuperValu and Richfood this appeal.

## II. Evidence

The evidence at trial showed that Johnson owned Marketplace Holdings, Inc., which served as a holding company for The Market, LLC, and Community Pride, Inc. (all three corporations will be referred to collectively as MPH

2

Companies).  Between 1992 and 2004, MPH Companies owned and operated eight grocery stores in the Richmond area.  During his time in the grocery business, Johnson developed several successful strategies for marketing to urban consumers.

Richfood, in its capacity as a wholesale grocery distributor, had supplied MPH Companies with grocery products for many years.  After SuperValu acquired Richfood in 1999, SuperValu became the exclusive grocery supplier for MPH Companies.  SuperValu, one of the nation's largest grocery wholesalers, also provided MPH Companies with other services, including warehousing and accounting, and extended to MPH Companies credit and loans.

In 2001, MPH Companies entered into a settlement agreement with SuperValu to resolve several long-standing problems between MPH Companies and Richfood.  In the agreement, SuperValu forgave MPH Companies' and Johnson's personal debt to SuperValu, which exceeded $17 million.  SuperValu also agreed to provide financing for MPH Companies to open and operate a new store, the Market at Tobacco Row (the Market) in Richmond.

Under the terms of the settlement agreement, SuperValu also entered into a consulting contract with Johnson and agreed to pay him $2 million over a five-year period.  However, the evidence showed that SuperValu never asked

3

Johnson to perform any consulting services under this contract.  Finally, the parties' settlement agreement stated that SuperValu would "provide appropriate assistance for other growth opportunities, subject to [the] SuperValu standard screening approval process."  Two years after the settlement agreement, MPH Companies experienced financial difficulties.  Johnson and Kenneth W. Smither, president of Marketplace Holdings, Inc., both concluded that in order for MPH Companies to remain in business, they needed to expand.  Executives from SuperValu, however, testified that they cautioned Johnson to stabilize his current store operations before attempting to acquire new stores.

In March 2003, Smither sent a letter to K. Richard Lane, president of SuperValu's eastern region, detailing MPH Companies' accomplishments and problems in the past year and outlining strategic plans.  In the letter, Smither stated that MPH Companies had depleted their capital funds due to overhead expenses and the opening of the Market, which had failed to meet sales forecasts and had experienced shortfalls in relation to those forecasts ranging between $50,000 and $70,000 per week. Smither indicated that due to recent financial performance problems, MPH Companies could not obtain additional bank loans.  Smither explained that MPH Companies needed SuperValu's assistance to replenish MPH Companies'

4

capital funds, to renovate one store, and to explore expansion opportunities.

SuperValu executives testified that they were concerned about the amount of credit SuperValu had already extended to MPH Companies. Therefore, according to the executives, SuperValu declined Smither's requests for additional funding but agreed to provide to Johnson advance payment under his consulting agreement so that Johnson could invest those funds and complete the proposed store remodeling.

After this decision, Johnson contacted Michael Jackson, president and chief operating officer for SuperValu, and asked him to reconsider SuperValu's denial of additional funding. Jackson testified that he explained to Johnson that SuperValu would not provide MPH Companies with additional money, but discussed with Johnson specific strategies for stabilizing his business and reducing overhead costs. According to Jackson, Johnson stated that he planned to invest in MPH Companies the money he obtained from the consulting agreement in order to stabilize his existing store operations.

Johnson, however, testified that he agreed to invest in MPH Companies the funds he received from the consulting agreement because Jackson promised Johnson that SuperValu would support MPH Companies' efforts to expand. According to Johnson, Jackson told him, "[I]f you put your money where your

5

mouth is, we'll put our money where our mouth is."  Johnson testified that he relied on this statement, and on Jackson's other assurances that SuperValu would support MPH Companies' expansion plans, when Johnson invested in MPH Companies the sum of $827,000 obtained from the advancement of the consulting fees.

In July 2003, Johnson approached the owner of Camellia Food Stores, Inc. (Camellia) and discussed Johnson's interest in purchasing Camellia.  Camellia owned 18 stores in the Eastern Shore region of Virginia and had experienced financial difficulties, having declared bankruptcy in 2001.

Also in July 2003, Johnson and Smither met with SuperValu executives to discuss MPH Companies' possible acquisition of Camellia.  MPH Companies needed SuperValu's approval because both Camellia and MPH Companies operated under supply agreements with SuperValu.

Joseph Della Noce, executive vice president of market support services for SuperValu, testified that when this meeting occurred, SuperValu had not yet made a decision about MPH Companies' proposed acquisition of Camellia.  However, Della Noce stated that he became concerned about the proposal after the meeting.  Della Noce explained that the demographics of the Eastern Shore region, where the Camellia stores were located, were different from Richmond's demographics.  When

6

asked by Johnson's counsel, "Did you have concerns of whether or not [Johnson] could serve the Caucasians in the Eastern Shore," Della Noce replied, "Yes."

In August 2003, Johnson and Smither met with executives from SuperValu and requested assistance in funding the acquisition of Camellia. Johnson asked the executives to consider several options for funding, including an option in which MPH Companies would sell one of its stores and use the proceeds to purchase Camellia, and SuperValu would provide additional funding for MPH Companies to renovate the Camellia stores. Della Noce testified that he was concerned about the amount of risk and additional debt that would result from the acquisition. SuperValu ultimately denied MPH Companies' request for funding.

Despite this decision by SuperValu, Johnson continued MPH Companies' efforts to acquire Camellia. Johnson and Smither testified that SuperValu attempted to prevent the acquisition of Camellia by requiring MPH Companies to purchase SuperValu's stock options in Camellia and by requiring payment on an outstanding debt before the acquisition. In addition, Johnson presented evidence that during MPH Companies' negotiations with Camellia, SuperValu had revealed confidential information concerning MPH Companies to another potential buyer for Camellia. According to Johnson and Smither, these actions by

7

SuperValu ultimately caused the negotiations with Camellia to fail.

By April 2004, MPH Companies could no longer meet current and past-due financial obligations, and MPH Companies' remaining grocery stores closed. At that time, MPH Companies owed SuperValu about $3.7 million.

Susan E. Rydberg, a former employee in SuperValu's information technology department, testified that in 2001 she heard members of SuperValu's senior management team discuss "phasing out" Johnson because he was a "complainer" and because SuperValu wanted to replace Johnson's stores with stores owned by SuperValu. When asked whether SuperValu's plans regarding Johnson, who is African-American, could have been racially motivated, Rydberg stated that SuperValu generally appeared to "phase out" a large number of women, African-Americans, and people over the age of 40.

SuperValu executives testified that they had never heard the terms "phasing out" or "staging out" and had no reason to attempt to damage Johnson's business enterprises. Jeffrey Noddle, chief executive officer of SuperValu, testified that SuperValu's wholesale business is dependent upon the success of independent retailers. Richard Lane, former president of SuperValu's "eastern region," acknowledged, however, that

8

SuperValu owned several Save-A-Lot grocery stores, which competed with the stores owned by MPH Companies.

Several witnesses testified that they observed a drastic decline in Johnson's physical and emotional health after the MPH Companies' stores closed. Johnson also presented expert medical testimony indicating that Johnson suffered from post-traumatic stress disorder, severe depression, and other physical health problems.

In addition, Johnson testified that after the stores closed, he was embarrassed and suffered a loss of credibility, which negatively affected his consulting business. Eric C. Frye, a financial analyst who qualified as an expert on the subject of "economic loss," testified that Johnson suffered various monetary losses in the total amount of $12.5 million as a result of SuperValu's actions.

### III. Jury Instructions

The jury received 46 instructions addressing Johnson's four different claims. The instructions relevant to this appeal were read to the jury in the order described below.

In jury instruction 23, the circuit court provided a definition of actual fraud, which stated: "Actual fraud is a misrepresentation of a material fact, knowingly and intentionally made, with the intent to mislead another person, which that person relied upon with the result that he was

damaged by it."  The jury then received instructions 24-26, which defined the concepts of material fact and reliance, and discussed certain circumstances that may be considered in deciding claims involving fraud.

Next, the circuit court read instruction 27 to the jury, stating:

> If you find that Plaintiff's fraud claims are premised on promises to be carried out in the future, as distinct from past or present facts, you may not make a finding of fraud merely because the promise was not kept.  Rather, you may only find in favor of the Plaintiff if he demonstrates by clear and convincing proof that at the time the representation was made the Defendant did not intend to perform the future promise.

Jury instructions 28-31 addressed the concepts of fiduciary duty, the elements of an actual fraud claim, and the damages recoverable for actual fraud when a plaintiff has proved that the defendant acted with actual malice.  Jury instruction 32 informed the jury that in considering damages on the actual fraud claim, the jury could consider Johnson's loss of earnings in the past or future, his personal financial losses directly related to the loss of business, his damages caused by embarrassment or humiliation as a result of the loss of business, and mental anguish Johnson suffered in the past and may suffer in the future.

Jury instruction 33, the first instruction specifically addressing constructive fraud, defined constructive fraud as

"a misrepresentation of a material fact, innocently or negligently made, with the intent that a person will rely on it and which that person relied upon with the result that he was damaged by it."  Jury instruction 34 defined the term "misrepresentation" and cautioned that a misrepresentation "must be made concerning an actually existing or past fact.  A promise, an expression of interest, or an expectation or opinion concerning the future is not a misrepresentation."

Jury instructions 35-38 addressed the concepts of negligence and contributory negligence in the context of a constructive fraud claim.  Thereafter, jury instruction 39 reviewed the elements of a constructive fraud claim, and jury instruction 40 informed the jury that if it found in favor of Johnson on the constructive fraud claim, the jury was permitted to "award those damages which would restore the plaintiff to the financial position he would have been in but for his detrimental reliance on the alleged fraud."

## IV. Analysis

### Constructive Fraud

SuperValu and Richfood (collectively, SuperValu) argue that the evidence is insufficient as a matter of law to support the jury verdict on the claim of constructive fraud. Distinguishing constructive fraud from actual fraud, SuperValu contends that an action for constructive fraud must be based

11

on an innocent or negligent misrepresentation of present fact and, as the jury was instructed in this case, may not be based on a promise of future action. SuperValu asserts that Johnson solely alleged and sought to prove that SuperValu did not fulfill promises to assist Johnson's business in the future. SuperValu further observes that while promises of future action can form the basis of a claim for actual fraud, the jury in this case rejected Johnson's claim of actual fraud.

In response, Johnson asserts that the law of the case doctrine bars SuperValu's argument. Johnson contends that jury instruction 27 permitted the jury to reach a verdict for Johnson on constructive fraud, based on evidence that SuperValu made promises to Johnson that SuperValu never intended to keep, because that instruction referred only to "fraud," rather than to "actual fraud." According to Johnson, instruction 27 presented a legally inaccurate definition encompassing constructive fraud that nevertheless was binding on the parties because SuperValu failed to raise an objection to this instruction. Thus, Johnson maintains that because he proved that SuperValu made promises to aid Johnson in his business in the future without any intent to keep those promises, the jury could have based its constructive fraud award on the language in jury instruction 27. We disagree with Johnson's arguments.

12

When reviewing jury instructions on appeal, we read the instructions together and consider them as a whole. H. W. Miller Trucking Co. v. Flood, 203 Va. 934, 937, 128 S.E.2d 437, 440 (1962); Van Duyn v. Matthews, 181 Va. 256, 261, 24 S.E.2d 442, 444 (1943); see Edlow v. Arnold, 243 Va. 345, 350, 415 S.E.2d 436, 438-39 (1992); Lerwill v. Regent Van & Storage, 217 Va. 490, 496, 229 S.E.2d 880, 884 (1976). Jury instructions that contain incorrect statements of law but were agreed upon by the parties become the law of the case. Ulloa v. QSP, Inc., 271 Va. 72, 80, 624 S.E.2d 43, 48 (2006); King v. Sowers, 252 Va. 71, 76-77, 471 S.E.2d 481, 485 (1996).

The law of the case doctrine, however, is inapplicable here because the parties did not agree to an improper jury instruction. Rather, instruction 27 provided a correct statement of law regarding actual fraud, and the instructions regarding constructive fraud unequivocally informed the jury that a claim of constructive fraud may not be based on a promise of future action.

The jury instructions given with regard to each of Johnson's claims were read together and were comprehensive, including the elements of the respective claims and the damages that could be recovered for each claim. The fact that jury instruction 27 referred to "fraud" and not to "actual fraud" is not determinative. That instruction was given after

13

the instruction defining "actual fraud," and before both the instruction stating the required elements of an actual fraud claim and the instruction explaining the damages recoverable for actual fraud. When considered in the context of the entire jury charge, it is apparent that jury instruction 27 applied only to the claim of actual fraud, and that the jury was instructed separately with regard to the constructive fraud claim. Therefore, we conclude that the law of the case doctrine does not apply to bar SuperValu's challenge to the jury verdict on the constructive fraud claim.

We next consider whether the evidence was sufficient to support the jury verdict on the constructive fraud claim. To prevail on a constructive fraud claim, a plaintiff must show by clear and convincing evidence that the defendant negligently or innocently made a false representation of material fact, and that the plaintiff suffered damage as a result of his reliance upon that misrepresentation. Prospect Dev. Co. v. Bershader, 258 Va. 75, 86, 515 S.E.2d 291, 297 (1999); Richmond Metro. Auth. v. McDevitt Street Bovis, Inc., 256 Va. 553, 558, 507 S.E.2d 344, 347 (1998); Blair Constr. v. Weatherford, 253 Va. 343, 346, 485 S.E.2d 137, 138 (1997).

Because fraud must involve a misrepresentation of a present or a pre-existing fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding

future events.  Prospect Dev. Co., 258 Va. at 86, 515 S.E.2d at 297; Tate v. Colony House Builders, 257 Va. 78, 82, 508 S.E.2d 597, 599 (1999); Patrick v. Summers, 235 Va. 452, 454, 369 S.E.2d 162, 164 (1988).  Nevertheless, if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud.[2]  Richmond Metro. Auth., 256 Va. at 559-60, 507 S.E.2d at 348; Colonial Ford Truck Sales v. Schneider, 228 Va. 671, 677, 325 S.E.2d 91, 94 (1985); see Blair Constr., 253 Va. at 346-47, 485 S.E.2d at 139.

Under no circumstances, however, will a promise of future action support a claim of constructive fraud.  See Richmond Metro. Auth., 256 Va. at 560, 507 S.E.2d at 348; Colonial Ford Truck Sales, 228 Va. at 677, 325 S.E.2d at 94.  The rationale underlying this rule is plain.  If unfulfilled promises, innocently or negligently made, were sufficient to support a constructive fraud claim, every breach of contract would

---

[2] In Eden v. Weight, 265 Va. 398, 578 S.E.2d 769 (2003), we stated that to prevail on a claim of constructive fraud, "misrepresentations must relate to a present or pre-existing fact, not statements involving promises or future events, unless the evidence shows an intent not to fulfill such promises when made."  265 Va. at 405, 578 S.E.2d at 773.  To the extent that this statement implies that an action for constructive fraud may lie if the evidence demonstrates a present intent not to fulfill a promise of future action, we overrule that statement.

15

potentially give rise to a claim of constructive fraud.  See

Richmond Metro. Auth., 256 Va. at 560, 507 S.E.2d at 348;

Blair Constr., 253 Va. at 347, 485 S.E.2d at 139; Lloyd v.

Smith, 150 Va. 132, 145, 142 S.E. 363, 365 (1928).

We hold that the evidence was insufficient as a matter of law to support the verdict on the constructive fraud claim. Johnson failed to present any evidence that SuperValu negligently or innocently misrepresented a present or pre-existing material fact.  Instead, viewed in the light most favorable to Johnson, the evidence showed only that SuperValu and its executives made promises to Johnson that SuperValu would provide future financial support and assistance to MPH Companies.[3]

Because Johnson's constructive fraud claim was based solely on SuperValu's promises of assistance to MPH Companies, Johnson failed as a matter of law to present an issue for the jury's consideration on the constructive fraud claim.  See Richmond Metro. Auth., 256 Va. at 559-60, 507 S.E.2d at 348; Colonial Ford Truck Sales, 228 Va. at 677, 325 S.E.2d at 94.

---

[3] In view of our holding that the evidence is insufficient as a matter of law to support Johnson's constructive fraud claim, we do not address the separate issue raised by SuperValu whether Johnson, individually, could recover damages for constructive fraud based on conduct SuperValu directed toward MPH Companies and its business operations.

16

Therefore, we hold that the circuit court erred in failing to set aside the jury verdict of constructive fraud.

Our conclusion is not altered by Johnson's contention that SuperValu waived its present argument that constructive fraud may not be based on promises of future action, because SuperValu did not raise the issue in its motions to strike during trial but first made the argument in its motion to set aside the jury verdict.  We consistently have held that while a motion to strike made during trial is an appropriate method of testing the sufficiency of the evidence, a party may also challenge the sufficiency of the evidence by a motion to set aside the verdict.  Little v. Cooke, 274 Va. 697, 718, 652 S.E.2d 129, 141 (2007); Gabbard v. Knight, 202 Va. 40, 43, 116 S.E.2d 73, 75 (1960); see Norfolk S. Ry. Co. v. Trimiew, 253 Va. 22, 24, 480 S.E.2d 104, 106 (1997).  Either approach is acceptable, because in both instances the trial judge is presented with the same question of law, whether the evidence is sufficient to support a jury verdict on the claim alleged.  Accordingly, SuperValu's argument concerning the sufficiency of the evidence of constructive fraud was properly preserved for appeal.

### Intentional Infliction of Emotional Distress

SuperValu argues that the evidence was insufficient as a matter of law to support the jury verdict for intentional

17

infliction of emotional distress. In particular, SuperValu contends that such a claim may not be based on mere "garden variety business decisions," such as SuperValu's decision not to lend MPH Companies additional funds when MPH Companies already owed SuperValu significant amounts of money. SuperValu further asserts this Court has never permitted a plaintiff to recover on a claim of intentional infliction of emotional distress "based solely on business dealings."

In response, Johnson contends that the jury necessarily found that SuperValu's actions were outrageous and that, viewed in the light most favorable to Johnson, the evidence supports such a finding. According to Johnson, SuperValu used its economic power to "break" Johnson. Johnson asserts that the jury was entitled to believe that SuperValu took these actions because it thought that Johnson, an African-American, was incapable of serving customers of a different race. We disagree with Johnson's arguments.

In order to recover on a claim of intentional infliction of emotional distress, a plaintiff must satisfy four elements of proof. The plaintiff must show that 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe.

Almy v. Grisham, 273 Va. 68, 77, 639 S.E.2d 182, 186 (2007); Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974); accord Harris v. Kreutzer, 271 Va. 188, 203, 624 S.E.2d 24, 33 (2006); Delk v. Columbia/HCA Healthcare Corp., 259 Va. 125, 136, 523 S.E.2d 826, 833 (2000); Jordan v. Shands, 255 Va. 492, 498-99, 500 S.E.2d 215, 218-19 (1998).

As we have recognized, the tort of intentional infliction of emotional distress is "not favored" in the law, because there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury. Almy, 273 Va. at 77, 639 S.E.2d at 187; Harris, 271 Va. at 203-04, 624 S.E.2d at 33; Russo v. White, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991); Ruth v. Fletcher, 237 Va. 366, 373, 377 S.E.2d 412, 415-16 (1989). Thus, we have held that a plaintiff alleging intentional infliction of emotional distress must prove his case by clear and convincing evidence. Russo, 241 Va. at 26, 400 S.E.2d at 162; Ruth, 237 Va. at 373, 377 S.E.2d at 416.

In the present case, based on SuperValu's argument, we focus our analysis of the sufficiency of the evidence on the question whether SuperValu's conduct, which occurred in the course of its business dealings with MPH Companies, was sufficient to support Johnson's claim of personal injury for intentional infliction of emotional distress. Johnson's claim

19

involving SuperValu's corporate conduct is uniquely different from our prior decisions addressing the tort of intentional infliction of emotional distress, because those prior decisions have involved allegations of conduct on the part of individual persons directed against other individual persons.

Here, viewed in the light most favorable to Johnson, the evidence showed that SuperValu executives sought to eliminate MPH Companies' stores from the Richmond market in favor of other stores owned by SuperValu, while promising to assist MPH Companies in expanding its business to other locations. Johnson also presented evidence that SuperValu executives targeted MPH Companies for elimination because those executives regarded Johnson as a "complainer," and that SuperValu generally appeared to "phase out" from its corporate relationships a large number of businesses operated by women, African-Americans, and persons over 40 years of age.

We hold that the evidence was insufficient as a matter of law to support a claim of intentional infliction of emotional distress.  This tort is directed at prohibiting conduct intended to cause personal, emotional damage to an individual, rather than conduct intended to cause economic damage to a business.  See Luddeke v. Amana Refrigeration, Inc., 239 Va. 203, 207, 381 S.E.2d 502, 504 (1990) (stating that intentional infliction of emotional distress is action for personal

injury, governed by two-year statue of limitations for personal injuries, Code § 8.01-243.)  Although a person may be so closely associated with the operation of a business that economic damage to that business may result in damage to the individual's emotional state, the tort of intentional infliction of emotional distress does not encompass such personal consequences of business conduct.

The evidence in the present record completely failed to establish that SuperValu's conduct was directed at harming Johnson, rather than at causing MPH Companies' grocery stores to be eliminated from competition in the grocery business. The absence of any evidence that SuperValu intended to harm Johnson personally is fatal to his claim from the outset.  A predicate requirement for any claim of intentional infliction of emotional distress is that the alleged harmful conduct was directed intentionally toward the affected individual.  In the absence of such conduct directed at a person individually, the law will not recognize a claim of intentional infliction of emotional distress.

Because the evidence before us was insufficient to support the jury verdict on the claim of intentional infliction of emotional distress, the circuit court erred in failing to set aside the jury verdict on this claim. Accordingly, we hold that both the constructive fraud claim

21

and the intentional infliction of emotional distress claim, which formed the basis of the jury's award in favor of Johnson, should not have been submitted to the jury for consideration, because the evidence was insufficient as a matter of law to support either claim.[4]

For these reasons, we will reverse the circuit court's judgment and enter final judgment in favor of SuperValu.

Reversed and final judgment.

JUSTICE KINSER, with whom JUSTICE LEMONS joins, concurring in part and dissenting in part.

I respectfully dissent from that portion of the majority opinion holding that jury instruction 27 applied only to the actual fraud claim. While the majority concludes that the instruction's use of the term "fraud" instead of the term "actual fraud" is not determinative, the majority's analysis ignores one salient fact – jury instruction 27 referred to "Plaintiff's fraud claims." (Emphasis added.) In my view, the reference to "fraud claims" is dispositive of this issue.

Generally, jury instructions are to be read together and viewed as a whole. H. W. Miller Trucking Co. v. Flood, 203 Va. 934, 937, 128 S.E.2d 437, 440 (1962); Clinchfield Coal Corp. v. Redd, 123 Va. 420, 446, 96 S.E. 836, 844 (1918).

---

[4] Based on our holdings, we do not address SuperValu's remaining assignments of error.

22

When reading the instructions together in this case, it is clear that the circuit court instructed the jury about two distinct fraud claims: one for actual fraud and one for constructive fraud. The verdict form also required the jury to make separate findings with regard to the claims for actual fraud and constructive fraud. Viewed in this context, I conclude that jury instruction 27 necessarily applied to both fraud claims. Because it uses the plural term "claims," it simply cannot be limited in scope to the actual fraud claim. Rather than actually looking at the jury instructions as a whole, as required by our precedent, the majority places all its emphasis on the grouping and numbering of the jury instructions, as well as the order in which the circuit court read them to the jury.

However, in doing so, the majority fails to acknowledge that the circuit court read to the jury several other instructions that were applicable to both the claim for actual fraud and the claim for constructive fraud, and these instructions were grouped in what the majority considers the set of actual fraud instructions. For example, the definitions of the terms "material fact" and "reliance" were numbered 24 and 25, respectively, and were read to the jury immediately after the definition of actual fraud and before jury instruction 27. Those definitions were not repeated when

the circuit court later read the instructions specifically referencing constructive fraud, but those definitions undoubtedly applied to both fraud claims.  Like actual fraud, the definition of constructive fraud includes, among other things, a misrepresentation of a <u>material fact</u> upon which a person <u>relies</u>.  Similarly, jury instruction 25 told the jury that "[i]n deciding whether <u>fraud</u> exists," it could consider certain circumstances such as the parties' "relative knowledge" and "their respective motives and intentions." (Emphasis added.)  In other words, jury instruction 27 was not the only instruction that pertained to both fraud claims and was, nevertheless, included in the so-called group of actual fraud instructions.

I also disagree with the majority's assertion that "the instructions regarding constructive fraud unequivocally informed the jury that a claim of constructive fraud may not be based on a promise of future action."  That statement is true only if jury instruction 27 is limited to the actual fraud claim.  Jury instruction 34, titled "Fraud-Definition of Misrepresentation" stated, in relevant part:

> A misrepresentation is any words or conduct which produce a false or misleading impression of fact in the mind of another.  The misrepresentation must be made concerning an actually existing or past fact.  A promise, an expression of interest, or an expectation or opinion concerning the future is not a misrepresentation.

24

Jury instruction 27 did not conflict with that statement of law but actually amplified it by telling the jury:

> If you find that plaintiff's fraud claims are premised on promises to be carried out in the future, as distinct from past or present facts, you may not make a finding of fraud merely because the promise was not kept. Rather, you may only find in favor of the plaintiff if he demonstrates by clear and convincing proof that at the time the representation was made, the defendants never intended to perform the future promise.

Thus, reading the jury instructions as a whole, I conclude that the jury was informed that both fraud claims could not be premised on promises to be carried out in the future and that a finding in favor of Johnson could be made only if, at the time of making such promises, SuperValu and Richfood never intended to fulfill them.

This conclusion does not end my analysis. Jury instruction 27 is legally incorrect since "representations predicated upon future events or promises cannot form the basis of an action for constructive fraud." Tate v. Colony House Builders, Inc., 257 Va. 78, 84, 508 S.E.2d 597, 600 (1999). However, as Johnson asserts, jury instruction 27 is the law of this case because it was given without objection. See Owens-Illinois, Inc. v. Thomas Baker Real Estate, Ltd., 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989) ("It is well settled that instructions given without objection become the

25

law of the case and thereby bind the parties in the trial court and this Court on review."); accord Ulloa v. QSP, Inc., 271 Va. 72, 80, 624 S.E.2d 43, 48 (2006); Oberbroeckling v. Lyle, 234 Va. 373, 379, 362 S.E.2d 682, 686 (1987).  And, "if there is any credible evidence which clearly and convincingly establishes a pertinent element of the instruction, the verdict" must be sustained.  Oberbroeckling, 234 Va. at 379, 362 S.E.2d at 686.

I agree with the majority's conclusion that the evidence viewed in the light most favorable to Johnson showed only that SuperValu and Richfood made promises about future financial support and assistance.  But, considering the law of this case as stated in jury instruction 27, that evidence supported the jury verdict in favor of Johnson on the constructive fraud claim.

SuperValu and Richfood, however, are correct that Johnson can recover only those damages that he personally sustained as a result of the constructive fraud.  Because Johnson filed this action in his individual capacity, and not as a derivative action, he cannot recover damages suffered by the MPH Companies, which are separate legal entities.[*]  See Keepe

---

[*] The inverse of this principle was recently decided by this Court in Little v. Cooke, 274 Va. 697, 708-13, 652 S.E.2d 129, 136-38 (2007), holding that damages to individual

v. Shell Oil Co., 220 Va. 587, 591, 260 S.E.2d 722, 724 (1979) ("The corporation is a legal person, separate and distinct from the persons who own it[;] and the corporation, as the alleged owner and operator of the business, is the person entitled to its profits and the person injured by the [alleged] wrongs.").

At trial, Johnson proved that he invested $827,000 of his own funds into the MPH Companies, but the evidence showed that he recouped $500,000 of that investment. The other damages that Johnson claimed were actually sustained by the MPH Companies. Thus, while I disagree with the majority and would reinstate the jury's finding that Johnson proved by clear and convincing evidence that SuperValu and Richfood committed constructive fraud against him, I would reduce the amount of the jury's award of compensatory damages from $15.5 million to $327,000, the amount that would compensate Johnson for the damages he personally suffered.

For these reasons, I respectfully concur, in part, and dissent, in part.

---

partners were not recoverable when the suit was brought as a derivative suit on behalf of the partnership.