Tara PENNELL, Plaintiff,

v.

**VACATION RESERVATION CENTER, LLC;  TNT Resorts, LLC,** Defendants.

Civil No. 4:11cv53.

United States District Court, E.D. Virginia, Newport News Division.

May 5, 2011.

Erika Louise Winter, Esquire, Williamsburg, VA, for Plaintiff.

Daniel Scott Gordon, Esquire, Richmond, VA, for Defendants.

### MEMORANDUM OPINION

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on defendants', Vacation Reservation Center, LLC and TNT Resorts, LLC, Motion to Dismiss Count IV of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss"). For the reasons set forth below, the Motion to Dismiss is **DENIED.**

## I. Factual and Procedural History

On or about July 17, 2009, the defendants, who both market timeshares and vacation packages hired the plaintiff, Tara Pennell, as a telephone sales person. On July 20, 2009, the plaintiff, who has a form of dwarfism, reported for the first time to the defendants' telemarketing office in order to work the 8:00 p.m. to midnight shift. Patricia Reck ("Reck"), who supervised the plaintiff, as well as managed and operated the telemarketing office at all relevant times, met the plaintiff in the building. Reck stated there was a problem and directed the plaintiff to go outside. Once outside, Reck told the plaintiff that two employees could not work with her because they claimed " 'if you walk in that room right now, they are going to pass out,' or words to that effect." Compl. ¶¶ 21 and 22, ECF No. 1. Reck explained that those employees were "frightened of and made ill by little people," id. ¶ 23, and "continued on about the dire effect Ms. Pennell's appearance would have on Defendants' employees." Id. ¶ 25.

Reck's comments deeply troubled the plaintiff, and she asked Reck if she could be placed on a day shift. Reck denied the request, told the plaintiff to go home for the night, and stated that she would figure out what to do and then inform the plaintiff. Reck changed her mind, however, and told the plaintiff " 'O.K., we're going to go ahead and take you in there and just see what happens.'" Id. ¶ 31. The plaintiff "felt she was treated like a zoo animal on display as Ms. Reck paraded her through the work area." Id. ¶ 32. Upon the plaintiff entering the room, an employee responsible for routing calls to sales people ran out of the room. The plaintiff

claims that Reck then took over that employee's responsibility, as said employee would not stay in the same room as the plaintiff. Between routing calls, Reck "engaged in a running commentary about Ms. Pennell's size which included statements such as, 'yeah this whole thing is crazy. I couldn't even find you at first. I was looking under desks and shit' and repeatedly referring to Ms. Pennell as 'Shorty.'" *Id.* ¶ 36. The plaintiff considered that such statements amused Reck, and Reck and some co-workers would laugh "uproariously with each comment." *Id.* ¶ 37. Following her shift, the plaintiff did not sleep and spent the night "thinking about the humiliation, embarrassment, and disrespect she had experienced." *Id.* ¶ 38.

On July 21, 2009, the plaintiff reported for her second shift. Upon arriving, the plaintiff met Reck outside of the telemarketing office. Reck told the plaintiff to wait to enter until another employee could get to another part of the building. After it was clear for them to enter, Reck directed the plaintiff to a desk and said, "'to tell you the truth, I didn't think you'd come back.'" *Id.* ¶ 42. Reck, again responsible for routing sales calls during the plaintiff's four-hour shift, routed the plaintiff four calls, whereas other employees received a minimum of thirty calls during that time. Throughout the shift, Reck again made comments such as "Shorty" and "can't find you." On July 22, 2009, the plaintiff reported for her third shift, Reck again routed the sales calls, and Reck again made comments such as "Shorty" and "can't find you." During that shift, Reck routed seven calls to the plaintiff, but only three were from persons qualified to purchase.

At the end of the plaintiff's third shift, Reck fired her, stating, "'I just don't think this job is for you.'" *Id.* ¶ 54. The plaintiff requested another chance and to be placed in a call routing position. Reck refused both requests. Upon her firing, the plaintiff had worked no more than twelve hours for the defendants. The plaintiff alleges that non-disabled employees were provided more hours and more potential customers before termination of employment. She also alleges that:

> As a result of Defendants' actions, [she] suffered depression, nervousness, and an inability to sleep. She had difficulty managing her day-to-day activities, became fearful of applying for other employment lest she be forced to suffer similar degradation and humiliation, and feared leaving the house where she worried she might frighten and sicken someone else. [The plaintiff] was unable to discuss much other than Defendants' treatment of her with her mother and sister, with whom she is very close, and kept retelling the experience needing to hear over and over that she was not a monster who sickened others. As a result of Defendants' actions, [she] spends countless hours worrying. about how to prepare her young daughter, who is also a dwarf, for the potential degradation and humiliation that may face her when she attempts to step into the workplace.

*Id.* ¶ 61.

On March 24, 2011, the plaintiff filed a Complaint (the "Complaint") against the defendants in this court pursuant to the American with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and to the common law of the Commonwealth of Virginia under the court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. The plaintiff seeks declaratory relief, equitable relief, and damages for unlawful discrimination in violation of the ADA. Of significance here, though, she also seeks damages for intentional infliction of emotional distress ("IIED"). On April 18, 2011, the defendants filed their Motion to Dismiss the IIED count. The

plaintiff responded in opposition on April 26, 2011, and the defendants replied on May 2, 2011. The Motion to Dismiss is ripe for review.

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must aver "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plausibility standard is not equivalent to a probability requirement, but the plaintiff must plead more than a "sheer possibility" that she is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the court will accept as true the factual allegations in a complaint, the court need not accept as true legal conclusions that are couched as factual allegations. *See id.* at 1949–50.

## III. Analysis

■ In order to state a claim for IIED under Virginia law, the plaintiff must allege facts showing that "(1) 'the wrongdoer's conduct was intentional or reckless'; (2) 'the conduct was outrageous and intolerable'; (3) 'there was a causal connection between the wrongdoer's conduct and the emotional distress'; and (4) 'the emotional distress was severe.'" *Hatfill v. New York Times Co.*, 532 F.3d 312, 325–26 (4th Cir.2008) (quoting *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974)). Even if the plaintiff did not suffer physical injury, a cause of action will lie in Virginia for emotional distress if the above four elements are shown. *Womack*, 210 S.E.2d at 148. The defendants challenge the sufficiency of the Complaint in pleading elements one, two, and four.

■ In challenging element one, the defendants assert that "[a]ll or part of the conduct relied upon by plaintiff was not intentional or reckless, as it was not directed towards [the plaintiff]." Mem. in Supp. of Mot. to Dismiss 4, ECF No. 5 [hereinafter "Mem. in Supp."]. Specifically, the defendants argue that they cannot be held liable for the conduct of the two employees that refused to work with the plaintiff because those individuals' comments were directed to Reck, and not to the plaintiff. The defendants also argue that the plaintiff does not allege facts that "support a conclusion that Reck intentionally or recklessly raised the co-worker's claim for the purpose of causing Pennell severe emotional distress." *Id.* at 5. The defendants' argument is erroneous. Nothing in the Complaint suggests that the plaintiff seeks to hold the defendants liable for the conduct of the two employees. Rather, the Complaint clearly states that "Defendants are liable for *Ms. Reck's conduct* through the doctrine of *respondeat superior.*" Compl. ¶ 86 (emphasis added); *see also id.* ¶¶ 83–85, 87, 88. Furthermore, the Complaint contains enough factual content to reasonably infer that Reck engaged in intentional or reckless conduct directed toward the plaintiff. *See SuperValu, Inc. v. Johnson*, 276 Va. 356, 666 S.E.2d 335, 344 (2008). Notably, the plaintiffs allege that during each of her three shifts, Reck engaged in running commentary regarding the plaintiff's dwarfism. As the defendants seem to concede, the factual allegation they single out is merely a "part of the conduct relied upon by the plaintiff" to state a claim for IIED. Mem. in Supp. 4. The court **FINDS** that the plaintiff has

sufficiently pled that Reck's conduct was intentional or reckless.

■ As regards the second element, the defendants argue that "[w]hether conduct is sufficiently outrageous to permit recovery initially is a question of law for the court," and Reck's "isolated comments ... do not rise to the atrocious and utterly intolerable standard." *Id.* at 6. The defendants are correct that the court first decides "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Womack,* 210 S.E.2d at 148; *see also Harris v. Kreutzer,* 271 Va. 188, 624 S.E.2d 24, 33 (2006) (recognizing the rule in the context of a motion testing the sufficiency of a complaint). In assessing Reck's conduct, however, the court is not determining whether it was outrageous and intolerable. Rather, the court determines whether "reasonable men may differ" over the interpretation of that conduct. *Womack,* 210 S.E.2d at 148.

The parties do not direct the court to any Virginia state court decisions applying the outrageousness standard to conduct directed at a person on account of that person's disability, nor is the court aware of any authority. The plaintiff does, however, direct the court to a case where, faced with a similar lack of guidance in the context of racial slurs and innuendo, the Fourth Circuit looked to the context of the alleged conduct to determine whether it could rise to the level of outrageous. *Gaiters v. Lynn,* 831 F.2d 51, 54 (4th Cir.1987). In finding the conduct complained of there was not outrageous, the Fourth Circuit noted that the "[t]he words spoken contained none of the shameful, explicit, racial epithets that sadly still afflict some segments of our society and whose well understood, traditional, unmistakable purpose has been to disparage, to demean, to humiliate and to hurt." *Id.* The court also observed that the words "in context [did not] convey the suggestions of incompetence or inferiority sometime evident in sly innuendo." *Id.*

■ This court agrees with the plaintiff that the same logic that guided the Fourth Circuit in *Gaiters* should guide this court to find that Reck's conduct could be "converted by its context [ ] to the sort of mean-spirited humiliation that might be considered an atrocious affront to accepted standards of decency." *Id.* It may not be outrageous for a large professional athlete to address a smaller teammate as "Shorty." However, in the context of a supervisor publicly addressing a new employee who is a dwarf, that same comment may be considered an explicit disparaging epithet, clearly understood to humiliate or disparage such person on the basis of her disability. *See Baird v. Rose,* 192 F.3d 462, 472 (4th Cir.1999) (recognizing that conduct may rise to the level of outrageous by virtue of the position of the wrongdoer as a person in actual authority over the plaintiff).[1] Additionally, the Complaint makes clear that Reck's conduct was not isolated, but rather pervaded the plaintiff's employment with the defendants. After reviewing Reck's conduct as pled, and construing it most favorably to the plaintiff, *see Gaiters,* 831 F.2d at 53–54, it is clear that reasonable men could disagree as to whether Reck's conduct was outrageous and intolerable. Accordingly, the court cannot find that, as a matter of law, the plaintiff failed to allege conduct "so outrageous as to exceed the bounds of decent society." *Baird,* 192 F.3d at 473. The

1. Moreover, the Complaint clearly alleges that Reck and other employees made the plaintiff's dwarfism a serious issue from the beginning of her first shirt. In that context, Reck's comments could certainly be construed as flagrant and outrageous.

court **FINDS** that the plaintiff has sufficiently pled the second element of an IIED claim.

■ As to the fourth element, the defendants argue that the plaintiff alleges "no more severe distress" than that which was alleged and found insufficient in *Russo v. White*, 241 Va. 23, 400 S.E.2d 160 (1991) and *Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24 (2006). In *Russo*, the Supreme Court of Virginia held that allegations of nervousness, an inability to sleep, stress and its physical symptoms, withdrawal from activities, and an inability to concentrate at work was not "the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163. In *Harris*, it affirmed that "nearly identical symptoms" are insufficient to satisfy the severity element of the IIED tort. *Harris*, 624 S.E.2d at 34. Although the plaintiff does allege symptoms that were alleged in those two cases, she also alleges other manifestations of emotional distress that are qualitatively different than those rejected in *Russo* and *Harris*.

Foremost, the plaintiff alleges that her distress was so severe that that she "had difficulty managing her day-to-day activities, became fearful of applying for other employment lest she be forced to suffer similar degradation and humiliation, and feared leaving the house where she worried she might frighten or sicken someone else." Compl. ¶ 61. In *Almy v. Grisham*, 273 Va. 68, 639 S.E.2d 182 (2007), the Supreme Court of Virginia held that allegations that "[e]very aspect of [her] life [was] fundamentally and severally altered, such that she had trouble even walking out of the front door" were sufficient to survive demurrer on the fourth element of an IIED claim. *Almy*, 639 S.E.2d at 188 (internal quotation marks omitted). The allegations in *Almy* are very similar to those in the Complaint. Additionally, unlike in *Russo*, the plaintiff's allegations allow for the reasonable inference that the plaintiff's emotional distress effectively confined her at home and led her to lose income. *See Russo*, 400 S.E.2d at 163 (remarking that the plaintiff did not allege such effects); *see also Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir.2005) (stating that under Federal Rule of Civil Procedure 8, allegations of severe emotional distress need only be specific enough to give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests).

Finally, the court notes that the plaintiff also alleges that she was so affected that she "was unable to discuss much other" than the defendants' misconduct with her mother and sister because she needed to be constantly told "she was not a monster who sickened others." Compl. ¶ 61. She also spends considerable time worrying about how to prepare her child, also a dwarf, for "potential degradation and humiliation" that the child may also face in the workplace. *Id.* ¶ 62. Emotional distress is sufficiently severe to survive a motion to dismiss where it fundamentally affects the plaintiff's interactions with her closest family members and outlook for her offspring's future. Because the Complaint does not contain mere allegations of an "effect on the plaintiff's sensitivities," *Russo*, 400 S.E.2d at 163, permitting the IIED count to survive a motion to dismiss does not risk the court "becom[ing] [an] arbiter[ ] of every human interaction that culminated in embarrassment, disappointment, or hurt feelings." *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 436 (4th Cir.2006). The court **FINDS** that the plaintiff has pled emotional distress "so severe that no reasonable person could be expected to endure it," *id.*, and thus suffi-

ciently pled the fourth element of an IIED claim.

## IV. Conclusion

For the reasons stated above, the court **FINDS** that Count IV of the Complaint states a claim for IIED upon which relief can be granted. Accordingly, the defendants' Motion to Dismiss is **DENIED.** The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion to counsel for the parties.

**IT IS SO ORDERED.**